Judge Ronald B. Leighton

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MAJOR MARGARET WITT,<br>Plaintiff,<br>v.<br>UNITED STATES DEPARTMENT OF THE AIR FORCE, et al.,<br>Defendants. | No. C06-5195 RBL<br>**DEFENDANTS' MOTION TO DISMISS AND DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br>(Note Defendant's Motion to Dismiss on Motion Calendar for June 9, 2006) |

Defendants, by and through undersigned counsel, respectfully move this Court pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Plaintiff's complaint for failure to state a claim upon which relief can be granted. Defendants additionally submit the following opposition to Plaintiff's Motion for Preliminary Injunction.

## I. INTRODUCTION

Plaintiff is a commissioned officer in the Air Force Reserves who has admittedly engaged in a sustained pattern of homosexual conduct. In November 2004, the Air Force suspended plaintiff without pay or retirement points under the "Don't Ask, Don't Tell" ("DADT") policy, as codified in statute, 10 U.S.C. § 654 (1993), and as implemented in Air Force Instruction ("AFI") 36-3209. From that time forward, plaintiff did not avail herself of her ability to

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 616-8482

challenge her suspension through application to the Air Force Board for Correction of Military Records. Now, approximately 17 months after her suspension, plaintiff has initiated this action and the accompanying motion for a preliminary injunction. These filings seek not only to preclude plaintiff's suspension but also to bar the Air Force from discharging her – even before the Air Force has determined whether plaintiff will be discharged. Moreover, in addition to litigating the question of her discharge through this action in federal court, plaintiff has requested a hearing in front of an Air Force Discharge Board.

Despite the legal reality that the constitutionality of the DADT policy has been uniformly upheld by circuit courts, plaintiff's action raises several constitutional challenges to the DADT policy. Like others before hers, plaintiff's action that is premised on an alleged constitutional infirmity with the DADT policy must be dismissed for failure to state a claim for relief, as summarized below.

With respect to her substantive due process challenge, plaintiff mistakenly contends that Lawrence v. Texas, 539 U.S. 558 (2003), recognizes a fundamental right to engage in consensual homosexual conduct. It does not. Nor does Lawrence disturb the Ninth Circuit precedent upholding the DADT policy under rational basis review. See Holmes v. Cal. Army Nat'l Guard, 124 F.3d 1126 (9th Cir. 1997); Philips v. Perry, 106 F.3d 1420 (9th Cir. 1997). Like the Ninth Circuit, Lawrence applied rational basis review.

Plaintiff next argues that the DADT policy creates an unconstitutional irrebuttable presumption under procedural due process. Plaintiff is incorrect. The irrebuttable presumption doctrine has been limited and discredited over the years. Whatever remains of the doctrine is governed by rational-basis review, see Burlington N. R.R. Co. v. Dep't of Pub. Serv., 763 F.2d 1106, 1113 (9th Cir. 1985), which again the DADT policy has survived many times over.

Plaintiff also contends that she has been denied her procedural due process right to a hearing on her suspension. There is no basis for this assertion because in the 17 months since her suspension plaintiff has not sought to challenge her suspension through the Air Force Board for Correction of Military Records, as she is permitted to do. Instead plaintiff now moves for preliminary injunctive relief now to restrain her discharge from the Air Force. Moving for such

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 616-8482

ultimate relief in a preliminary injunction is inappropriate and illogical, especially since plaintiff has not been discharged yet.

More broadly, all of plaintiff's due process counts also fail because plaintiff has not identified a deprivation of her life, liberty, or property interests. As a Reservist, plaintiff has not property interest in her continued employment in the Reserves. See Sims v. Fox, 505 F.2d 857, 862 (5th Cir. 1974); Alberico v. United States, 783 F.2d 1024, 1027 (Fed. Cir. 1986). Nor has plaintiff suffered any injury to her liberty interest in her reputation, since she admits that she engaged in consensual homosexual conduct.

Plaintiff similarly fails to state an equal protection claim. Homosexuals or persons who engage in homosexual conduct are neither a suspect class, nor a quasi-suspect class. See Holmes, 124 F.3d at 1132; Philips, 106 F.3d at 1425. Thus, rational basis review applies, which the DADT policy undisputably satisfies.

Plaintiff's First Amendment count is premised on her discharge from the Air Force, an event that has not yet occurred. Beyond its prematurity, Courts have repeatedly sustained DADT against First Amendment challenges. See Holmes, 124 F.3d at 1136; Philips, 106 F.3d at 1430.

In addition to the failure of plaintiff's action to state a claim for relief, plaintiff's motion for a preliminary injunction fails. At the outset, it must be recognized that Courts exercise a high level of deference when reviewing a request to review a military personnel decisions – a standard that can only be heightened in the context of a preliminary injunction. Plaintiff fails to meet her high burden with respect to a preliminary injunction, as briefly set forth below.

As made clear from the reasons that plaintiff's complaint should be dismissed, plaintiff does not have a likelihood of success on the merits.

Plaintiff's inability to earn retirement points and pay through service in the Reserves does not rise the level of being an judicially recognized irreparable injury. Plaintiff could have pursued other employment to mitigate these losses, and plaintiff has had the opportunity to contest her suspension through the Air Force Board for Correction of Military Records. Nor is the prospect of discharge from the military an irreparable injury, see Chilcott v. Orr, 747 F.2d 29, 34 (1st Cir. 1984).



UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 616-8482

Finally, granting a preliminary injunction here would contravene public interest by interfering with the legislature and executive's control over the military, and it would impede the military's ability to make personnel decisions with minimal judicial interference.

For these reasons, plaintiff's action should be dismissed, and her motion for a preliminary injunction should be denied.

## II. THE CHALLENGED STATUTE AND INSTRUCTION

The so-called "Don't Ask, Don't Tell" policy, as codified at 10 U.S.C. § 654, became law in 1993. It represented a culmination of a joint effort by the Executive and Legislative Branches to reach consensus on the controversial issue of homosexual conduct by members of the armed services. On January 29, 1993, President Clinton directed the Secretary of Defense to review the military policy then in force. See 29 Weekly Comp. Pres. Doc. 112 (1993). The Defense Department studied the issue and met with groups and individuals holding a wide spectrum of views. At the same time, Congress undertook its own extensive review of homosexual conduct in the Armed Forces, holding multiple hearings over several months on the topic and receiving testimony from military commanders, gay rights activists, experts in military personnel policy, and many interested civilians and members of the Armed Forces. As part of its legislative decision-making process, Congress examined the historical background of the military's policy on homosexual conduct, the role of unit cohesion in developing combat readiness, and the experience of foreign militaries with the issue. See S. Rep. No. 103-112, at 269-70 (1993).

Notable among the testimony that Congress considered was that of General Colin Powell, who was then Chairman of the Joint Chiefs of Staff. He explained that the Joint Chiefs had "spent an enormous amount of time considering this issue," "challeng[ing their] own assumptions," considering "the history of the issue," and "argu[ing] with each other." Id. at 279. General Powell further testified that the Joint Chiefs consulted with a variety of persons, including commanders at every level, enlisted troops, and family members of service members. Id. They also examined the arguments of gay/lesbian rights proponents. Id. General Powell emphasized that the Joint Chiefs' concern was "the unique perspective of the military and what is best for military effectiveness." Id. They concluded that the presence of persons in the

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 616-8482

military who engage in, or are likely to engage in, homosexual acts "would have an unacceptable detrimental and disruptive impact on the cohesion, morale, and esprit of the armed forces." Id. at 278.

Following extensive debate, President Clinton announced (29 Weekly Comp. Pres. Doc. 1369 (1993)), and Congress enacted a new statute governing homosexual conduct in the Armed Forces. See National Defense Authorization Act for Fiscal Year 1994, Pub. L. No. 103-160, § 571, 107 Stat. 1670-73, codified at 10 U.S.C. § 654. The resulting statute, 10 U.S.C. § 654, is grounded in fifteen legislative findings. 10 U.S.C. § 654(a). Those include Congress's recognition that "[m]ilitary life is fundamentally different from civilian life" because of "the extraordinary responsibilities of the armed forces, the unique conditions of military service, and the critical role of unit cohesion." § 654(a)(8)(A). Accordingly, "military society is characterized by its own laws, rules, customs, and traditions, including numerous restrictions on personal behavior, that would not be acceptable in civilian society." § 654(a)(8)(B). In addition, Congress also understood that "[t]he standards of conduct for members of the armed forces regulate a member's life for 24 hours each day beginning at the moment the member enters military status and not ending until that person is discharged or otherwise separated from the armed forces," § 654(a)(9) and that "[t]hose standards of conduct, including the Uniform Code of Military Justice, apply to a member of the armed forces at all times that the member has a military status, whether the member is on base or off base, and whether the member is on duty or off duty." § 654(a)(10). Congress also concluded that:

> (13) The prohibition against homosexual conduct is a longstanding element of military law that continues to be necessary in the unique circumstances of military service.
>
> (14) The armed forces must maintain personnel policies that exclude persons whose presence in the armed forces would create an unacceptable risk to the armed forces' high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability.
>
> (15) The presence in the armed forces of persons who demonstrate a propensity or intent to engage in homosexual acts would create an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability.

§§ 654(a)(13)-(15).

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 616-8482

Based on these Congressional findings, § 654 then provides for separation from service in three situations related to homosexual conduct by a member of the armed forces. § 654(b). As relevant in this case, separation is provided for where a member has "engaged in, attempted to engage in, or solicited another to engage in a homosexual act." § 654(b)(1). But, separation for engaging in homosexual conduct is not required if the service member can demonstrate that he or she has satisfied all of the following criteria:

> (A) Such conduct is a departure from the member's usual and customary behavior;
> (B) Such conduct, under all the circumstances, is unlikely to recur;
> (C) Such conduct was not accomplished by use of force, coercion, or intimidation;
> (D) Under the particular circumstances of the case, the member's continued presence in the armed forces is consistent with the interests of the armed forces in proper discipline, good order, and morale; and
> (E) The member does not have a propensity or intent to engage in homosexual acts.

§ 654(b)(1).

With regard to members of the Reserves, the Air Force has issued Air Force Instruction 36-3209, which incorporates the principles of § 654 into its procedures for separation from the Reserves. Air Force Instruction 36-3209 sets forth Air Force policy implementing § 654, see AFI 36-3209 § 1.15. Further, AFI 36-3209 mirrors § 654's language with respect to situations where discharge will occur, see, e.g., § 2.30.1. And, the instruction also provides procedural safeguards for this separation process, by providing an opportunity to avoid discharge by making the five showings set forth in § 654(b)(1), see AFI 36-3209 §§ 1.15, 2.30.1.1., and by entitling a service member to a hearing before an Air Force Discharge Board before being discharged for homosexual conduct, see AFI 36-3209 § 2.30.2.

## III. ARGUMENT

### A. This action should be dismissed because Plaintiff fails to state a claim for relief.

#### 1. Standard for motion to dismiss.

Under Fed. R. Civ. P. 12 (b)(6), a complaint should be dismissed if, after reviewing the complaint in the light most favorable to the plaintiff, it appears that the plaintiff can prove no set of facts in support of the claim which would entitle plaintiff to relief. Smilecare Dental Group v.

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 616-8482

Delta Dental Plan of California, Inc., 88 F.3d 780, 783 (9th Cir. 1996); Kowal v. MCI Communications Corp, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Applying the above standard, plaintiff's case must be dismissed for failure to state a claim upon which relief can be granted.

**2. Ninth Circuit precedent uniformly rejects plaintiff's challenges to the constitutionality of the DADT policy.**

The constitutionality of the DADT policy has been repeatedly affirmed by an unbroken line of Ninth Circuit precedent and by decisions from other Circuits. See Holmes v. Cal. Army Nat'l Guard, 124 F.3d 1126, 1134 (9th Cir. 1997) (observing that "our own circuit precedent plus the authority from every other circuit court that has addressed this issue establishes that the military has a legitimate interest in discharging service members on account of homosexual conduct"). In light of this controlling precedent, it is clear that "'[a]ny argument that Congress was misguided in [concluding that homosexual conduct would affect military effectiveness] is one of legislative policy, not constitutional law.'" Id. (quoting Thomasson v. Perry, 80 F.3d 915, 929 (4th Cir. 1996) (en banc)). As demonstrated below, moreover, this line of circuit precedent is not altered by the Supreme Court's decision in Lawrence v. Texas, 539 U.S. 558 (2003). Accordingly, plaintiff's challenges to the constitutionality of 10 U.S.C. § 654 and AFI 36-3209 should be dismissed, pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim upon which relief can be granted.

This circuit has consistently upheld the military's authority under the DADT policy to discharge those who engage in homosexual conduct, as well as under the prior no-tolerance policy for homosexual conduct in the military. The current DADT policy was sustained against due process, equal protection, and First Amendment challenges in Holmes v. California Army National Guard, 124 F.3d 1126 (9th Cir. 1997), and against equal protection and First Amendment challenges in Philips v. Perry, 106 F.3d 1420 (9th Cir. 1997). The military's previous policy was upheld against a First Amendment challenge in Pruitt v. Cheney, 963 F.2d 1160 (9th Cir. 1992), and against a due process challenge in Beller v. Middendorf, 632 F.2d 788 (9th Cir. 1980).

Other circuits have similarly and unanimously upheld the military's policies regarding

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 616-8482

homosexual conduct. See Able v. United States, 155 F.3d 628, 631-36 (2d Cir. 1998) (upholding the DADT policy); Richenberg v. Perry, 97 F.3d 256, 260-62 (8th Cir. 1996) (same); Thomasson v. Perry, 80 F.3d 915, 927-31, 934 (4th Cir. 1996) (en banc) (same); Walmer v. United States, 52 F.3d 851, 854-55 (10th Cir. 1995) (upholding old policy); Woodward v. United States, 871 F.2d 1068, 1076 (Fed. Cir. 1989) (same); Dronenburg v. Zech, 741 F.2d 1388, 1391-98 (D.C. Cir. 1984) (same); Rich v. Secretary of Army, 735 F.2d 1220, 1227-30 (10th Cir. 1984) (same).

Nor does the Supreme Court's decision in Lawrence v. Texas, 539 U.S. 558 (2003), disturb the force of this line of precedent. The longstanding rule in the Ninth Circuit is that, "[a] three-judge panel can overrule a prior decision of this court [only] when an intervening Supreme Court decision undermines an existing precedent of the Ninth Circuit, and both cases are closely on point." E.E.O.C. v. Luce, Forward, Hamilton & Scripps, 345 F.3d 742, 744 n.1 (9th Cir. 2003) (en banc) (internal quotation marks and citations omitted); accord Miller v. Gammie, 335 F.3d 889, 899-900 (9th Cir. 2003) (en banc) (same); Benny v. U.S. Parole Comm'n, 295 F.3d 977, 983 (9th Cir. 2002) (explaining that a panel is bound by the decisions of prior panels "unless an en banc decision, Supreme Court decision or subsequent legislation undermines those decisions."). A fortiori, this Court is bound by the Ninth Circuit's decisions in Holmes and Philips unless Lawrence is "closely on point." That is not the case here.

To begin with, Lawrence did not address a policy, as here, implicating the "'special circumstances and needs of the armed forces.'" Philips, 106 F.3d at 1426 (quoting Beller, 632 F.2d at 810). This distinction is significant due to the deference owed by the judiciary to the legislative and executive branches in the area of military policy. The Supreme Court has explained that "[t]he constitutional power of Congress to raise and support armies and to make all laws necessary and proper to that end is broad and sweeping," United States v. O'Brien, 391 U.S. 367, 377 (1968), and that "'judicial deference * * * is at its apogee' when Congress legislates under its authority to raise and support armies." Rumsfeld v. Forum for Academic & Institutional Rights, Inc., 126 S. Ct. 1297, 1306 (2006) (quoting Rostker v. Goldberg, 453 U.S. 57, 70 (1981); see Thomasson, 80 F.3d at 924 ("The Constitution assigns the conduct of military affairs to the Legislative and Executive branches," and "[t]here is nothing timid or half-hearted

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 616-8482

about this constitutional allocation of authority."). "This is especially the case where, as here, the challenged restriction was the result of exhaustive inquiry by Congress in hearings, committee and floor debate." Able, 155 F.3d at 632 (citing Rostker, 453 U.S. at 64, 72). Compounding the deference due to legislative and executive branches is the Supreme Court's recognition of the judiciary's limitations in this area:

> [I]t is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches.

Gilligan v. Morgan, 413 U.S. 1, 10 (1973).

Here, in enacting the challenged statute, the Senate Armed Services Committee expressly stated that its policy regarding homosexual conduct was based on the unique needs and circumstances of military life and military service:

> The committee's review and its recommendation have focused on the impact of homosexual conduct in the unique setting of military service. Therefore, if the Supreme Court should reverse its ruling in [Bowers v. Hardwick, 478 U.S. 186 (1986)] and hold that private consensual homosexual acts between adults may not be prosecuted in civilian society, this would not alter the committee's judgment as to the effect of homosexual conduct in the armed forces. The committee finds that there are no significant developments in civilian society that would require a change in military policy.

S. Rep. No. 103-112, at 287 (emphasis added). Thus, as Judge Tashima has persuasively analyzed, "Lawrence does not impliedly overrule [the Ninth Circuit's decision in] Holmes. Holmes was based on the special needs of the military, a subject that Lawrence does not address. Thus, the two cases are not 'closely on point,' and Holmes remains the law of the circuit." Hensala v. Dep't of Air Force, 343 F.3d 951, 959 n.1 (9th Cir. 2003) (Tashima, J., concurring in part and dissenting in part) (internal quotations and citations omitted).[1]

To further distinguish Lawrence, it addressed the type of constitutional challenge that then-Judge Kennedy noted was not at issue in Beller – "ones in which the state seeks to use its

---

[1] The panel majority in Hensala did not take issue with Judge Tashima's analysis, but instead chose not to address the question of whether Lawrence called into question prior circuit precedent because it had not been addressed by the district court. See id. at 956 ("Because the claim has not been presented to the district court, we decline to address it on appeal."); id. at 959 ("We need not, and do not, reach the question of whether [Lawrence] has effectively overruled Holmes.").

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 616-8482

criminal processes to coerce persons to comply with a moral precept even if they are consenting adults acting in private without injury to each other." 632 F.2d at 810 (emphasis added). See Lawrence, 539 U.S. at 578 (holding that "[t]he State cannot demean their existence or control their destiny by making their private sexual conduct a crime."). That the challenged statute and implementing regulations do not impose criminal penalties further distinguishes this case from Lawrence, and refutes plaintiff's assertion that § 654 must be subjected to heightened scrutiny.

Also, in direct contradiction to plaintiff's assertions, the Supreme Court did not characterize the right at issue in Lawrence as being "fundamental," nor did the Court apply strict scrutiny, the proper standard when fundamental rights are implicated. To the contrary, the Court invalidated the Texas statute on rational-basis grounds, holding that it "furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual," 539 U.S. at 578, which is the hallmark of rational basis review. As the United States District Court for the District of Massachusetts has recently explained in dismissing a like constitutional challenge to the DADT policy:

> [B]eyond what the Lawrence majority said or did not say, there is the matter of what it actually did, which was, apparently, to review the challenged Texas statute under the standard of review appropriate when there is not a fundamental interest at stake. If the Lawrence court had been evaluating the constitutionality of the Texas statute under the more exacting standard applicable to cases where fundamental interests are at stake, it would instead have asked whether the state interest was "compelling," rather than whether it was "legitimate." Thus, by the standard of review it applied, the Lawrence Court signaled that it did not consider that a fundamental liberty interest arising under the Due Process Clause was implicated.

Cook v. Rumsfeld, No. 04-12546, 2006 WL 1071131, at *7 (D. Mass. April 24, 2006)) (internal citation and footnote omitted); accord Muth v. Frank, 412 F.3d 808, 817-18 (7th Cir. 2005) (finding that Lawrence did not announce a fundamental right of adults to engage in all forms of private consensual sexual conduct); Lofton v. Sec'y Dep't Children & Family Servs., 358 F.3d 804, 816 (11th Cir. 2004) (stating that "language and reasoning [of Lawrence] are inconsistent with standard fundamental-rights analysis."), cert. denied, 543 U.S. 1081 (2005); Loomis v. United States, 68 Fed. Cl. 503, 518 (Fed. Cl. 2005) ("The fact remains that the [Supreme] Court did not hold that sodomy is a fundamental right."). Thus, by applying rationality review, the

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 616-8482

Supreme Court in Lawrence followed the exact same level of constitutional scrutiny as the Ninth Circuit did in Holmes, Philips, Pruitt, and Beller.

In sum, the Lawrence holding does not disturb the Ninth Circuit precedent upholding the constitutionality of the DADT policy. First, Lawrence is not on point – it did not involve military personnel decisions, but it did involve criminal punishments, which are not at issue here. And second, despite these differences, Lawrence applied rational basis review as the Ninth Circuit has done in upholding DADT policy. In short, then, plaintiff's substantive due process, equal protection, and First Amendment challenges to the DADT policy should be dismissed with prejudice because plaintiff has no basis in law for those claims.

**3. Plaintiff does not state a claim for a due process violation.**

**a. Plaintiff's substantive due process rights have not been injured.**

Plaintiff does not state a claim for a violation of substantive due process. As explained above, plaintiff is incorrect in asserting that Lawrence recognized a fundamental right to engage in consensual homosexual acts. Lawrence, 539 U.S. at 586 (Scalia, J., dissenting); Cook, 2006 WL 1071131, at *7; Loomis, 68 Fed. Cl. at 518. Without a fundamental right at issue, the rational basis test governs the review of the DADT policy. See Washington v. Glucksberg, 521 U.S. 702, 728 (1997). Also, as made clear above, courts show extreme deference in reviewing military policies. Rostker, 453 U.S. at 70; Thomasson, 80 F.3d at 924. Applying these principles here leaves no doubt that § 654 and AFI 36-3209 do not offend substantive due process protections.

After extensive hearings, Congress found that service "in the armed forces of persons who demonstrate a propensity or intent to engage in homosexual acts would create an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability." 10 U.S.C. § 654(a)(15). Congress had ample grounds for reaching this informed, rational judgment, notably its goal of promoting unit cohesion, reducing sexual tension, and protecting personal privacy.

Congress found that members of the military may be required "to make extraordinary sacrifices, including the ultimate sacrifice, to provide for the common defense." § 654(a)(5). In

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 616-8482

order to achieve success in combat, Congress found it was necessary that military units be characterized by "high morale, good order and discipline, and unit cohesion." § 654(a)(6). As the Senate Armed Services Committee recognized, members of the Armed Forces "are not recruited for a single job at a single location. They must be capable of serving not as an individual, but as a member of a team, in a variety of assignments and locations, often under dangerous and life-threatening conditions." S. Rep. No. 103-112, at 273. Congress therefore found that "[o]ne of the most critical elements in combat capability is unit cohesion, that is, the bonds of trust among individual service members that make the combat effectiveness of a military unit greater than the sum of the combat effectiveness of the individual unit members." 10 U.S.C. § 654(a)(7).

These findings were based on testimony of military leaders on the importance of unit cohesion. For example, General H. Norman Schwarzkopf, U.S. Army (Ret.), testified that unit cohesion "is the single most important factor in a unit's ability to succeed on the battlefield." S. Rep. No. 103-112, at 275. General Colin Powell likewise testified that, "[t]o win wars, we create cohesive teams of warriors who will bond so tightly that they are prepared to go into battle and give their lives if necessary for the accomplishment of the mission and for the cohesion of the group and for their individual buddies." Id. at 275.

Congress similarly recognized that unit cohesion is improved by reducing or eliminating sexual tension from distracting the members of the unit and by protecting the personal privacy of service members. As the Senate Armed Services Committee recognized, among both heterosexuals and homosexuals, "[s]exual behavior is one of the most intimate and powerful forces in society," and, "[w]hen dealing with issues involving persons of different genders * * * the armed forces do not presume that servicemembers will remain celibate or that they will not be attracted to members of the opposite sex. Rather, the military specifically provides men and women with separate quarters in order to ensure privacy because experience demonstrates that few remain celibate and many are attracted to members of the opposite sex." Id. at 284. Indeed, the Senate Armed Services Committee expressly noted that "[t]he separation of men and women is based upon the military necessity to minimize conditions that would disrupt unit cohesion,

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 616-8482

such as the potential for increased sexual tension that could result from mixed living quarters." Id. at 277-78. As General Powell testified, "[c]ohesion is strengthened or weakened in the intimate living arrangements we force upon our people. * * * In our society gender differences are not considered conducive to bonding and cohesion within barracks living spaces." Id. at 278. Thus, because "[s]exual behavior is one of the most intimate and powerful forces in society," id. at 281, the Senate Armed Services Committee found that it was reasonable for the military to take these factors into account in establishing gender-based assignment policies. Id. at 278.

Just as "[i]t is reasonable for the armed forces to take these factors into consideration in establishing gender-based assignment policies," it also "is reasonable for the armed forces to take [them] into consideration when addressing issues concerning persons who engage in or have the propensity or intent to engage in sexual activity with persons of the same sex." Id. at 278. See Richenberg, 97 F.3d at 262 ("[I]t is rational to assume that both homosexuals and heterosexuals 'are likely to act in accordance with their sexual drives.'" (quoting Steffan v. Perry, 41 F.3d 677, 692 (D.C. Cir. 1994))). As the Senate Armed Services Committee recognized, it would be "irrational * * * to develop military personnel policies on the basis that all gays and lesbians will remain celibate or that they will not be sexually attracted to others." S. Rep. No. 103-112, at 278. As noted, the military seeks to reduce sexual tension and protect personal privacy among heterosexuals by providing men and women with separate berthing and bathing facilities. In addition to accommodating privacy concerns, the separation by gender serves to reduce the sexual "temptations facing heterosexuals" who, "like homosexuals, are likely to act in accordance with their sexual drives" despite rules that bar such sexual encounters. Steffan, 41 F.3d at 692.

But, while the military is able to promote unit cohesion, reduce sexual tension, and protect personal privacy in the case of heterosexual service members by providing separate quarters for men and women, such an accommodation is not available for those individuals who engage in homosexual conduct, "[t]he military could not eliminate the difficulties of quartering homosexuals with persons of the same sex by totally segregating homosexuals." Id. at 692. Thus, as the en banc D.C. Circuit recognized in Steffan, far from stemming from irrational bias

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 616-8482

or stereotypes, "heterosexuals and homosexuals are treated differently because the means at the military's disposal for dealing with the natural phenomenon of sexual attraction differ for the two." Id. Rather, § 654 "accommodates the reasonable privacy concerns of heterosexual service members and reduces the sexual problems that may arise when some members of the unit have a propensity or intent to engage in homosexual acts and others do not. These same concerns for privacy and sexual tension explain the military's policy of providing service men and women with separate living quarters." Thomasson, 80 F.3d at 929-30.

Thus, in enacting § 654, Congress emphasized that it was attempting to devise a policy that respects the fact that, in the military setting, homosexuals, unlike heterosexuals, will be called upon to share intimate living arrangements with individuals to whom they may be sexually attracted. As General Powell explained:

> [O]pen homosexuality in units is not just the acceptance of benign characteristics such as color or gender or background. It involves matters of privacy and human sexuality that, in our judgment, if allowed to exist openly in the military, would affect the cohesion and well-being of the force. It asks us to deal with fundamental issues that the society at large has not yet been able to deal with.

S. Rep. No. 103-112, at 281. General Powell therefore testified that "it would be prejudicial to good order and discipline" if the military required heterosexuals and persons who demonstrate that they do or are likely to engage in homosexual acts "to share the most private facilities together, the bedroom, the barracks, latrines, and showers." Id. at 283. The Senate Armed Services Committee quoted these comments of General Powell and noted that they "do not reflect an irrational prejudice against gays and lesbians. His comments, which the Committee endorses, represent a prudent evaluation of the impact of such behavior on the armed forces, and underscore the fact that the policy is based upon prudence, not prejudice." Id.

These considerations amply justify the statutory policy enacted by Congress. As the Ninth Circuit explained in response to a similar challenge, "the Navy has explained that in its judgment separating members who engage in homosexual acts is necessary to further military effectiveness by maintaining unit cohesion, accommodating personal privacy and reducing sexual tension." Philips, 106 F.3d at 1429. The Ninth Circuit in Philips continued by acknowledging that "we cannot say that the Navy's concerns are based on 'mere negative

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 616-8482

attitudes, or fear, unsubstantiated by factors which are properly cognizable' by the military. Nor can we say that avoiding sexual tensions lacks any 'footing in the realities' of the Naval environment in which Philips served." Id. (quoting Cleburne v. Cleburne Living Ctr., 473 U.S. 429, 448 (1985)). The Second, Fourth, and Eighth Circuits echo this conclusion that the DADT policy satisfies rational basis review. See Able, 155 F.3d at 636 (holding that "[t]he testimony of numerous military leaders, the extensive review and deliberation by Congress, and the detailed findings set forth in the Act itself provide a 'reasonably conceivable state of facts,' to uphold the Act."); Thomasson, 80 F.3d at 929 ("It was legitimate * * * for Congress to conclude that sexual tensions and attractions could play havoc with a military unit's discipline and solidarity. It was appropriate for Congress to believe that a military force should be as free as possible of sexual attachments and pressures as it prepared to do battle. Any argument that Congress was misguided in this view is one of legislative policy, not constitutional law."); Richenberg, 97 F.3d at 262 ("Military leaders have determined that excluding those with a propensity to engage in homosexual acts, like providing separate housing for men and women, reduces sexual tensions that would jeopardize unit cohesion, the cornerstone of an effective military. * * * Given these rational concerns, Congress and the President may rationally exclude those with a propensity or intent to engage in homosexual acts.").

**b. Nor has plaintiff been denied procedural due process under an irrebuttable presumption legal theory.**

Plaintiff's procedural due process "irrebuttable presumption" theory of recovery should similarly be rejected. The so-called irrebuttable presumption doctrine upon which plaintiff relies has been sharply criticized as enabling boundless judicial rewriting of legislative policy. See Cleveland Bd. of Educ. v. LaFleur, 414 U.S. 632, 652 (1974) (Douglas, J., concurring) ("as a matter of logic, it is difficult to see the terminus of the road upon which the Court has embarked under the banner of 'irrebuttable presumptions.'"); see also Note, The Irrebuttable Presumption Doctrine in the Supreme Court, 87 Harv. L. Rev. 1534, 1556 (1974) ("There appears to be no justification for the irrebuttable presumption doctrine."). Whatever is left of this doctrine has been limited to the facts of those cases, and has not been extended to other situations such as the

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 616-8482

case here, involving a temporary suspension without pay. See Gilbert v. Homar, 520 U.S. 924, 932 (1997) ("Unlike the employee in Loudermill, who faced termination, respondent faced only a temporary suspension without pay.").

Rather, the more appropriate constitutional standard to follow in reviewing legislation that does not implicate a fundamental right is rational basis review. See Washington v. Glucksberg, 521 U.S. 702, 728 (1997); Williamson v. Lee Optical Co., 348 U.S. 483, 487-88 (1955). Consistent with the Supreme Court's guidance, the Ninth Circuit makes explicit that the irrebuttable presumption doctrine does not apply where a statute passes rationality review: "An irrebuttable presumption is not per se unconstitutional and does not demand an individualized hearing so long as it is rational." Burlington N. R.R. Co. v. Dep't of Pub. Serv., 763 F.2d 1106, 1113 (9th Cir. 1985). Thus, whatever remains of the irrebuttable presumption doctrine fails to apply when the presumption at issue is rational. And, as explained above, the DADT statute and instruction satisfy rationality review, leaving plaintiff without a valid claim.

Plaintiff's due process challenge also fails because the DADT statute and instruction do not contain irrebuttable presumptions. Rather, the Air Force specifically provides that a member who is being discharged is entitled to a hearing in front of a discharge board. AFI 36-3209, § 230.2 (Apr. 14, 2005). In addition, the Air Force allows a service member who engaged in homosexual conduct to avoid discharge by demonstrating the following:

> (A) Such conduct is a departure from the member's usual and customary behavior;
> (B) Such conduct, under all the circumstances, is unlikely to recur;
> (C) Such conduct was not accomplished by use of force, coercion, or intimidation;
> (D) Under the particular circumstances of the case, the member's continued presence in the armed forces is consistent with the interests of the armed forces in proper discipline, good order, and morale; and
> (E) The member does not have a propensity or intent to engage in homosexual acts.

10 U.S.C. § 654(b)(1); see also AFI 36-3209, § 230.1.1. By providing this opportunity to explain instances of homosexual conduct, the Air Force does not irrebuttably presume that a service member who has engaged in homosexual conduct should be discharged. In short, there is no irrebuttable presumption at issue here.

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 616-8482

For these reasons, resorting to the so-called irrebuttable doctrine does not provide a basis for relief for plaintiff.

**c. Plaintiff has not been denied a right to a hearing.**

Plaintiff next argues that the Air Force denied her a reasonably prompt hearing after her suspension in November 2004. Plaintiff's argument fails for two reasons: (1) Air Force procedure provides plaintiff with the ability to challenge her suspension; and (2) plaintiff's requested relief – that she not be discharged – is factually and legally distinct from her right to a hearing regarding her suspension.

First, in contrast to plaintiff's argument, Air Force procedures provide an ample opportunity for plaintiff to challenge her suspension. Because that suspension was reduced to writing (Compl. App. F), it constituted a military record. See 10 U.S.C. § 1552(g) ("In this section, the term 'military record' means a document or other record that pertains to . . . an individual member or former member of the armed forces . . ."). As a military record, plaintiff's suspension was subject to challenge through application to the Air Force Board for Correction of Military Records (the "AFBCMR").

The AFBCMR is comprised of Air Force civilians, see 32 C.F.R. § 865.1, and it considers applications to correct any Air Force record when necessary to correct an error or injustice. See 10 U.S.C. § 1552(a)(1); 32 C.F.R. § 865.0. When appropriate to correct an error or injustice, the AFBCMR directs correction of military records or recommends such correction. 32 C.F.R. § 865.2; AFI 36-2603, § 2.1. The Air Force has also issued a pamphlet which provides guidance on applying to the AFBCMR. See AFP 36-2607 (available at www.e-publishing.af.mil/pubfiles/ af/36/afpam36-2607/afpam36-2607.pdf). In light of the opportunity to apply to the AFBCMR to correct an error or injustice, plaintiff has had the ability from November 2004 until present to contest her suspension through application to the AFBCMR. Plaintiff did not apply to the AFBCMR to challenge her suspension. Thus, plaintiff has no cause of action against the Air Force for her failure to apply to the AFBCMR for correction of her suspension.

Second, plaintiff cannot leverage an alleged violation of a right to a hearing with respect

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 616-8482

to her suspension into relief regarding the ultimate discharge decision. Notably, plaintiff has not been denied a hearing regarding her discharge from the Air Force because plaintiff has not been discharged yet. The cases cited by plaintiff similarly do not support plaintiff's position. For instance, Barry v. Barchi, which plaintiff describes as "instructive" is hardly so. 443 U.S. 55 (1979). While the Court declared that the lack of a post-deprivation hearing for a 15-day suspension from horse-racing was unconstitutional, the Court was not considering a discharge from horse-racing altogether. Id. at 59. Similarly, in United States v. Two Hundred & Ninety Five Ivory Carvings, the Ninth Circuit held that, after a delayed hearing, seized property had to be returned – what was taken had to be returned. 689 F.2d 850, 858 (9th Cir. 1982). Notably, the Ninth Circuit explained that such a result did not preclude over action by the government:

> To require the government to return property it has seized and held in violation of a property owner's right to a reasonably prompt post-seizure hearing does not deprive the government of any other sanctions, criminal or civil, that may be available for protecting society's interests and does not unnecessarily infringe on society's competing interest in the administration of criminal justice.

Id. Similarly here, even if plaintiff did not have a hearing regarding her suspension, that would not enable plaintiff to bar the Air Force from determining whether she should be discharged.

**d. All of plaintiff's due process claims fail because plaintiff has not been deprived of a life, liberty, or property interest.**

Plaintiff's due process claims fail at the most basic level because Plaintiff has not been deprived of a life, liberty or property interest. As a fundamental principle, a violation of the Due Process Clause occurs only when a person has been deprived of life, liberty or property without due process of law. U.S. Const. amend. V ("No person shall be . . . deprived of life, liberty, or property, without due process of law."). Yet, plaintiff has not identified any life, liberty, or property interest that is implicated as a result of being suspended from the Air Force Reserves, and thus her complaint should be dismissed.

Plaintiff does not have protected property interest in her employment in the Air Force Reserve. To have a protected property interest under the Due Process Clause, a person must have more than a unilateral expectation of it, he must instead have a legitimate claim of entitlement to it. Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972) ("To have

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 616-8482

property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it."). Plaintiff serves at the pleasure of the President and may be released by the President. See 10 U.S.C. § 12203(c) ("Appointments of Reserves in commissioned grades are for an indefinite term and are held during the pleasure of the President."); 10 U.S.C. § 12681 ("Subject to other provisions of this title, reserve commissioned officers may be discharged at the pleasure of the President."). Because her employment in the Reserves is always contingent on the pleasure of the President, plaintiff has no legitimate claim of entitlement to it and thus no property interest in uninterrupted service in the Reserves. See Sims v. Fox, 505 F.2d 857, 862 (5th Cir. 1974) (holding that an Air Force Reserve Officer has no property interest in continued military employment); Alberico v. United States, 783 F.2d 1024, 1027 (Fed. Cir. 1986) (holding that "Reserve officers . . . have no reasonable expectations of continued employment and thus no property interests protected by the due process clause"); see also Doe v. Garrett, 903 F.2d 1455, 1462 (11th Cir. 1990) ("It is well established that a military officer's expectation of continued military employment does not rise to the level of a property interest unless it is rooted in some statute, regulations, or contract."); Kinney v. United States, 51 Fed. Cl. 126, 130 (Fed. Cl. 2001) (holding that an active duty officer had no property interest his military status).

Nor has plaintiff been deprived of a liberty interest. The liberty interest protected by the Due Process Clause in the employment context centers around concern for a person's reputation and good name. See Jones v. Dep't of Navy, 978 F.2d 1223, 1226 (Fed. Cir. 1992). But, here, plaintiff's reputation and good name have not been affected by any more than what plaintiff herself admits publicly – that she has engaged in consensual homosexual conduct. See Witt Aff. ¶ 12. Finally, to the extent that plaintiff complains regarding the effect of her discharge board hearing on her reputation, her claim is premature; that hearing has not yet taken place.

In short, the Due Process Clause, in either substantive or procedural manifestations, provides no basis for relief here.

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 616-8482

**4. Plaintiff does not state a claim for an equal protection violation.**

To the extent that her complaint's mention of "equal protection" in ¶ 32 amounts to an allegation that § 654 and AFI 36-3209 violate her equal protection rights, that count must be also dismissed for failure to state a claim upon which relief can be granted.

Rational basis review is the appropriate standard for reviewing plaintiff's equal protection challenge. Section 654 and AFI 36-3209 contain classifications regarding homosexual conduct of members of the military; they are not classifications based on homosexual orientation. 10 U.S.C. § 654(b); AFI 36-3209, § 2.30.1. Persons who engage in homosexual conduct do not constitute a suspect or a quasi-suspect class. See See Holmes, 124 F.3d at 1132; Philips, 106 F.3d at 1425; High Tech Gays v. Def. Indus. Sec. Clearance Office, 895 F.2d 563, 571 (9th Cir. 1990). Consequently, plaintiff's equal protection claim is reviewed under rational basis review.

As explained above, § 654 and AFI 36-3209 serve legitimate governmental interests and are rational means of realizing those interests. Consequently, it should come as no surprise that the courts of appeals have unanimously determined that § 654 satisfies rational basis review under the Equal Protection Clause. See Able, 155 F.3d at 636 ("We conclude that under rational basis review § 654 does not violate the Equal Protection Clause of the Constitution."); Philips, 106 F.3d at 1429 ("[B]ound by our precedent that the relationship between the Navy's mission and its policy on homosexual acts is not so attenuated as to render the distinction arbitrary and irrational, we hold that [§ 654] does not violate Philips's right to equal protection."); Richenberg, 97 F.3d at 262 ("Given these rational concerns, Congress and the President may rationally exclude those with a propensity or intent to engage in homosexual acts."); Thomasson, 80 F.3d at 931 ("In sum, we conclude that the Act represents a legitimate legislative match of ends and means that withstands appellant's equal protection challenge.").

In sum, under rational basis review and the persuasive force of precedent, plaintiff has no viable equal protection claim.

**5. Plaintiff does not state a claim under the First Amendment.**

Plaintiff's complaint also claims that "any discharge of Major Witt pursuant to 10 U.S.C.

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 616-8482

§ 654 and AFI No. 36-3209 would violate the free speech clause of the First Amendment." (Compl. at ¶ 33.) That allegation is insufficient to state a claim for relief.

First, plaintiff's challenge is factually premature. Plaintiff's own allegation expressly premises her First Amendment challenge on her discharge from the Air Force. (Id.) Yet, as plaintiff herself admits, she not yet been discharged. (Compl. at ¶ 31 ("As of the date of the filing of this complaint, the date of Major Witt's administrative discharge hearing has not been set.").) Thus, as of now, plaintiff's complaint does not identify a valid claim for relief – even if plaintiff were to have redress under the DADT statute for a First Amendment violation.

Second, § 654 has been repeatedly upheld against First Amendment challenges. See Holmes, 124 F.3d at 1136; Philips, 106 F.3d at 1430. As these holdings make clear, the DADT policy does not run afoul of the First Amendment. Consequently, plaintiff has not stated a claim for relief under the First Amendment.

**B. Plaintiff does not satisfy the requirements for a preliminary injunction.**

**1. Standards for preliminary injunction.**

A preliminary injunction is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997). The Ninth Circuit has cautioned that granting a preliminary injunction involves "the exercise of a very far reaching power never to be indulged except in a case clearly warranting it." Dymo Indus., Inc. v. Tapeprinter, Inc., 326 F.2d 141, 143 (9th Cir. 1964).

To obtain this preliminary injunctive relief, a party " must fulfill one of two standards, described in this circuit as 'traditional' and 'alternative.'" Cassim v. Bowen, 824 F.2d 791, 795 (9th Cir. 1987) (quoting Am. Motorcyclist Ass'n v. Watt, 714 F.2d 962, 965 (9th Cir. 1983)). Under the traditional standard, a court may issue such relief if it finds that "(1) the moving party will suffer irreparable injury if the relief is denied; (2) the moving party will probably prevail on the merits; (3) the balance of potential harm favors the moving party; and (4) the public interest favors granting relief." Burlington N. R.R. Co. v. Dep't of Revenue, 934 F.2d 1064, 1074 n.6 (9th Cir. 1991) (quoting Cassim, 824 F.2d at 795)). Under the alternative standard, the moving

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 616-8482

party may meet its burden by demonstrating either "(1) a combination of probable success and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips sharply in its favor." Id. (quoting Cassim, 824 F.2d at 795).

Despite the "either/or" phrasing of the standard for a preliminary injunction, "cases have made it clear . . . that there are not really two entirely separate tests, but that they are merely extremes of a single continuum." Benda v. Grand Lodge of Int'l. Ass'n of Machinists & Aerospace Workers, 584 F.2d 308, 315 (9th Cir. 1978). In other words, [t]hese two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases. Oakland Tribune, Inc. v. Chronicle Publ'g Co., Inc., 762 F.2d 1374, 1376 (9th Cir. 1985); see also Rodeo Collection, Ltd. v. West Seventh, 812 F.2d 1215, 1217 (9th Cir. 1987). It must be shown as an "irreducible minimum" that there is at least a fair chance of success on the merits. Stanley v. Univ. of S. California, 13 F.3d 1313, 1319 (9th Cir. 1994) (quoting Martin v Int'l Olympic Comm., 740 F.2d 670, 674-75 (9th Cir. 1984)). Additionally, "[u]nder any formulation of the test, plaintiff must demonstrate that there exists a significant threat of irreparable injury." Oakland Tribune, 762 F.2d at 1376; City of Tenakee Springs v. Block, 778 F.2d 1402, 1407 (9th Cir. 1985).

Furthermore, courts must be particularly cautious in disrupting the status quo where injunctive relief would interfere in administrative procedure. See Heckler v. Lopez, 463 U.S. 1328,1333 (1983) (stating general principle that a district court's injunctive power should not be a basis for "propel[ling] the court into the domain which Congress has set aside exclusively for the administrative agency" (quoting SEC v. Chenery Corp., 332 U.S. 194, 196 (1947))).

Finally, the standard for preliminary injunctive relief is heightened in the instance of a challenge to a government personnel decision. As the Supreme Court explained in Sampson v. Murray, which involved a government employee who sought a temporary injunction restraining the termination of her employment:

> Assuming for the purpose of discussion that respondent has made a satisfactory showing of loss of income and had supported the claim that her reputation would be damaged as a result of the challenged agency action, we think the showing falls far short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction in this type of case.

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 616-8482

415 U.S. 61, 91-92 (1974) (emphasis added). This heightened standard is particularly appropriate in cases challenging military personnel decisions. See Guerra v. Scruggs, 942 F.2d 270, 274 (4th Cir. 1991) ("We believe that Sampson's higher requirement of irreparable injury should be applied in the military context given the federal courts' traditional reluctance to interfere with military matters.").

**2. Plaintiff does not have a likelihood of success on the merits.**

Plaintiff's request for a preliminary injunction should be denied because plaintiff cannot sustain a likelihood of success on the merits. As demonstrated above, this action should be dismissed because plaintiff does not have actionable constitutional claims against the DADT policy. Moreover, for plaintiff to prevail, it would require the Court to make a significant deviation from existing precedent; such a rarity cannot constitute a substantial likelihood of success on the merits.

**3. Plaintiff will not be irreparably injured.**

Nor has plaintiff demonstrated an irreparable injury. She has not yet been discharged, and she could have challenged her suspension by applying to the AFBCMR. Plaintiff's alleged injury is economic in nature as a result of not being permitted to participate in Reserve employment – which does not merit preliminary injunctive relief. See Guerra, 942 F.2d at 274 (determining that for a service member who admittedly used cocaine, the fact that he was "forced to seek civilian employment with a military record which carries a stigma with it" did not constitute irreparable harm sufficient to sustain a preliminary injunction.); see also Adams v. Vance, 570 F.2d 950, 957 (D.C. Cir. 1978) (no irreparable injury when Eskimos were denied whaling for one year). Moreover, during the course of her suspension, plaintiff has had the opportunity to mitigate the effect of this economic loss; she could have pursued other part-time employment, thus negating any irreparable aspect of her loss of pay. See Lanvin, Inc., v. Colonia, Inc., 739 F. Supp. 182, 192-93 (S.D.N.Y. 1990) ("Any party claiming an injury is under a duty to mitigate its damages. A movant for extraordinary relief cannot mask an ongoing failure on its part to mitigate its damages as an ongoing instance of irreparable harm.").

Plaintiff can also seek redress of her alleged injuries through the Air Force. As

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 616-8482

mentioned above, she can appeal to the AFBCMR to alter her military records regarding pay and points. And, even taking plaintiff's presumptive fears regarding her potential discharge under general conditions at their worst, (Witt Aff. ¶ 26), plaintiff would still have the ability to appeal those with an Air Force Discharge Board, and the stigma associated with a General Discharge is not considered irreparable. See Chilcott v. Orr, 747 F.2d 29, 34 (1st Cir. 1984) ("[T]he prospect of a general discharge under honorable conditions is not an injury of sufficient magnitude to warrant an injunction."). For these reasons, any alleged injury to plaintiff will not be irreparable.

**4. The public interest disfavors a preliminary injunction here.**

Granting a preliminary injunction here would also contravene the public interest. Doing so would harm Congress's interest in regulating the military by permitting judicial second-guessing in an area of extreme deference to the executive and legislative branches. See Rostker, 453 U.S. at 70; Thomasson, 80 F.3d at 924; see also Adams, 570 F.2d at 954 (vacating district court's grant of immediate injunctive relief where so doing would "deeply intrude into the core concerns of the executive branch"). In that same vein, granting a preliminary injunction would impede with the military's ability to make personnel decisions with minimal judicial interference. See Chilcott, 747 F.2d at 32 ("Interference by the judiciary with the administration of the military would undermine this nation's ability to maintain a disciplined and ready fighting force."); Parrish v. Brownlee, 335 F. Supp. 2d 671, 675 (E.D.N.C. 2004).

## IV. CONCLUSION

For the foregoing reasons, plaintiff's action should be dismissed for failure to state a claim upon which relief may be granted. Moreover, plaintiff's motion for preliminary injunction should be denied because plaintiff cannot demonstrate a likelihood of success on the merits, an irreparable injury, or a benefit to the public interest.

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 616-8482

Dated: May 8, 2006

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JOHN MCKAY
United States Attorney

VINCENT M. GARVEY
Deputy Branch Director

MARION J. MITTET
Assistant United States Attorney

/s/
PETER J. PHIPPS
United States Department of Justice
Civil Division, Federal Programs Branch
Tel: (202) 616-8482
Fax: (202) 616-8470
E-mail: peter.phipps@usdoj.gov

Mailing Address:
Post Office Box 883, Ben Franklin Station
Washington, D.C. 20044

Courier Address:
20 Massachusetts Ave., N.W.
Washington, D.C. 20001

*Attorneys for Defendants*

Of Counsel:
MAJOR TRACEY ROCKENBACH
AFLSA/JACL Military Personnel Litigation
1501 Wilson Blvd, 7th Floor
Rosslyn, VA 22209-2403

(C06-5195-RBL) DEFENDANTS' MOTION TO DISMISS AND DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION - 25

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 616-8482

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

**CERTIFICATE OF SERVICE**

I hereby certify that on May 8, 2006, I electronically filed the foregoing Defendants' Motion to Dismiss and Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following person:

James E. Lobsenz
Carney Badley Spellman, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104
Tel: (206) 622-8020
Fax: (206) 622-8983
E-mail: lobsenz@carneylaw.com

Aaron H. Caplan
American Civil Liberties Union of Washington
705 Second Avenue
Seattle, WA 98104
Tel: (206) 624-2184
E-mail: caplan@aclu-wa.org

Nicki McCraw
Carney Badley Spellman, P.S.
701 Fifth Avenue, Suite 3600
Seattle, WA 98104
Tel: (206) 622-8020
Fax: (206) 622-8983
E-mail: mccraw@carneylaw.com

/s/
PETER J. PHIPPS
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883, Ben Franklin Station
Washington, DC 20044
Tel: (202) 616-8482
Fax: (202) 616-8470
E-mail: peter.phipps@usdoj.gov
*Attorney for Defendants*