1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Honorable Ronald B. Leighton

UNITED STATES DISTRICT COURT
WESTERN WASHINGTON
AT TACOMA DIVISION

MAJOR MARGARET WITT,

               Plaintiff,

v.

UNITED STATES DEPARTMENT OF
THE AIR FORCE; ET AL.,

               Defendants.

No. C06-5195 RBL

**DECLARATION OF SHER KUNG
IN SUPPORT OF MOTION FOR
SANCTIONS DUE TO
SPOLIATION OF EVIDENCE**

NOTE ON MOTION CALENDAR:
AUGUST 6, 2010

ORAL ARGUMENT REQUESTED

Pursuant to 28 U.S.C. § 1746, I, Sher Kung, hereby declare as follows:

      1.      I am counsel for the plaintiff and have personal knowledge of the facts contained in this Declaration.

      2.      Attached hereto as Exhibit A is a chronology of events relevant to this motion, created to aid the court in following the timeline of events.

      3.      Attached hereto as Exhibit B is a true and correct copy of excerpts from the deposition of Lieutenant General Charles E. Stenner, dated May 17, 2010.

      4.      Attached hereto as Exhibit C is a true and correct copy of excerpts of Defendants' Objections and Responses to Plaintiff's First Requests for Admission, Interrogatories, and Requests for Production.

**AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION**
901 Fifth Avenue #630
Seattle, Washington 98164
(206) 624-2184

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

5.      Attached hereto as Exhibit D is a true and correct copy of excerpts from the deposition of Colonel Mary L. Walker, dated January 8, 2010.

6.      Attached hereto as Exhibit E is a true and correct copy of excerpts from the deposition of Colonel Janette Moore-Harbert, dated February 25, 2010.

7.      Attached hereto as Exhibit F is a true and correct copy of excerpts from the deposition of Captain Jill Robinson, dated March 16, 2010.

8.      Attached hereto as Exhibit G is a true and correct copy of document AF027162, the CDI memo from Colonel Janette Moore-Harbert to Lieutenant Colonel Patrick Kearney, dated 24 January 2008, which was produced by Defendants (*filed under seal*).

9.      Attached hereto as Exhibit H is a true and correct copy of documents AF027164-AF027168, a the Incident Report Summary issued by McChord AFB, which includes a transcription of the Tacoma Police Report, which was produced by Defendants (*filed under seal*).

10.      Attached hereto as Exhibit I is a true and correct copy of document AF027163, the Investigating Officer's Report from Lieutenant Colonel Patrick Kearney to 446 AES/CC, dated 4 February 2008, which was produced by Defendants (*filed under seal*).

11.      Attached hereto as Exhibit J is a true and correct copy of AF027091 and AF027098, excerpts from the "AFRC Courts-Martial and Serious Incident Report," dated January 2008, which was produced by Defendants (*filed under seal*).

12.      Attached hereto as Exhibit K is a true and correct copy of AF027136, excerpts from the "AFRC Special Interest Cases," dated May 2008, which was produced by Defendants (*filed under seal*).

13.      Attached hereto as Exhibit L is a true and correct copy of excerpts from the deposition of Major General Eric Crabtree, dated March 24, 2010.

14.      Attached hereto as Exhibit M is a true and correct copy of AF001613, a memo from Major General Duignan to 4 AF/CC, dated July 7, 2004, which was produced by Defendants.

15.      Attached hereto as Exhibit N is a true and correct copy of AF000153, a letter dated July 27, 2004, from James Lobsenz to Major Adam Torem.

DECL. OF SHER KUNG IN SUPP. OF MOT. FOR SANCTIONS
DUE TO SPOLIATION OF EVIDENCE
 (Case No. 06-5195)– Page 2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

16.     Attached hereto as Exhibit O is a true and correct copy of excerpts of Plaintiff's Second Set of Requests for Production of Documents and Things.

17.     On May 10, 2010, government counsel, Sarah Dunne and I participated in a telephonic conference to discuss outstanding discovery matters.  Attached hereto as Exhibit P is a true and correct copy of a letter dated May 11, 2010, from Sarah Dunne to Bryan Diederich, memorializing the May 10 conversation.

18.     Attached hereto as Exhibit Q is a true and correct copy of a letter dated May 12, 2010, from Bryan Diederich to Sarah Dunne.

19.     Attached hereto as Exhibit R are true and correct copies of Defendants' cover letters for supplemental productions of documents, dated June 11, 16, and 18.

20.     Attached hereto as Exhibit S is a true and correct copy of a letter dated June 24, 2010, from Bryan Diederich to Sarah Dunne.

21.     On July 1, 2010, government counsel, Sarah Dunne and I participated in a telephonic conference to discuss our understanding of Defendants' actions to locate, search and preserve documents as detailed in their June 24 letter.  Attached hereto as Exhibit T is a true and correct copy of a letter dated July 2, 2010 from Sarah Dunne to Bryan Diederich, memorializing the conversation.

22.     Attached hereto as Exhibit U is a true and correct copy of a letter dated July 9, 2010, from Bryan Diederich to Sarah Dunne.

23.     Attached hereto as Exhibit V is a true and correct copy of a letter dated July 14, 2010, from Sarah Dunne to Bryan Diederich.

24.     Attached hereto as Exhibit W is a true and correct copy of a memorandum dated June 21, 2010, from the Air Force to Major Margaret Witt, including attachments.

25.     Attached hereto as Exhibit X is a true and correct copy of a records request dated June 28, 2010, and an Honorable Discharge certificate sent to Plaintiff.

26.     Attached hereto as Exhibit Y is a true and correct copy of excerpts from the deposition of Major Margaret Witt, dated May 24, 2010.

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue #630
Seattle, Washington 98164
(206) 624-2184

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

27.     Attached hereto as Exhibit Z is a true and correct copy of AF000402, the cover page of the Record of Board Proceedings of Major Margaret Witt dated 28 & 29 September 2006, which was produced by Defendants.

28.     Attached hereto as Exhibit AA is a true and correct copy of AF001612, a memorandum dated 7 July 2004, from Major General Eric Crabtree to Adam Torem, which was produced by Defendants.

29.     Attached hereto as Exhibit BB is a true and correct copy of AF000009, a memorandum dated 5 Nov 2004, from Colonel Mary L. Walker to Major Margaret Witt, which was produced by Defendants.

I declare under penalty of perjury that the foregoing is true and correct, and that this Declaration was executed on July 22, 2010 in Seattle, Washington.

/s/ Sher S. Kung
Sher Kung, WSBA # 42077

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue #630
Seattle, Washington 98164
(206) 624-2184

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2010, I electronically filed this *Declaration of Sher Kung in Support of Motion for Sanctions Due to Spoliation of Evidence* with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Peter Phipps

peter.phipps@usdoj.gov

Marion J. Mittet

Jamie.Mittet@usdoj.gov

Bryan R. Diederich

bryan.diederich@usdoj.gov

Stephen J. Buckingham

Stephen.Buckingham@usdoj.gov

Attorneys for Defendants

DATED this 22nd day of July, 2010.

AMERICAN CIVIL LIBERTIES UNION OF WASHINGTON FOUNDATION

By: /s/ Nina Jenkins
Nina Jenkins
Legal Program Assistant
901 Fifth Avenue #630
Seattle, WA 98164
Tel. (206) 624-2184
njenkins@aclu-wa.org

DECL. OF SHER KUNG IN SUPP. OF MOT. FOR SANCTIONS
DUE TO SPOLIATION OF EVIDENCE
 (Case No. 06-5195)– Page 5

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue #630
Seattle, Washington 98164
(206) 624-2184

# EXHIBIT A

### *Witt v. U.S. Air Force et al.*

Chronology of Significant Events In Support of
Plaintiff's Motion for Sanctions Due to Spoliation of Evidence

| Date | Subject | Source |
|------|---------|--------|
| **June 14, 2004** | A third party civilian notifies the Air Force that Maj Witt has engaged in homosexual conduct | Kung Decl. Ex. Y (16:1-17:23) |
| **?** | Col Crabtree receives "order" from Air Force Reserve Headquarters concerning Maj Witt | Kung Decl. Ex. L (14:21-15:17, 16:6-10) |
| **?** | Crabtree seeks authorization from Maj Gen Duignan, 4th AF, forwarding him evidence of the allegations | Kung Decl. Ex. L (28:13-22, 29:16-23) |
| **July 7, 2004** | Maj Gen Duignan authorizes a fact-finding inquiry after review of evidence | Kung Decl. Ex. M |
| **July 7, 2004** | Crabtree appoints Maj Adam Torem to conduct a fact-finding inquiry | Kung Decl. Ex. AA |
| **July 27, 2004** | James Lobsenz gives notice of his representation of Maj Witt to the JAG investigation officer | Kung Decl. Ex. N |
| **July 27, 2004** | Defendants are on notice that Witt intends to challenge any adverse actions.  Defendants do not put a litigation hold on any key decision makers. | Kung Decl. Exs. P, Q, S, T, U, V |
| **Nov 5, 2004** | Witt is suspended from duty and is notified of the administrative discharge action against her | Kung Decl. Ex. BB |
| **Oct 2005** | Col Moore-Harbert becomes commander of 446th AES | Kung Decl. Ex. E (18:16-18) |
| **Apr 12, 2006** | Witt files complaint in District Court, naming as defendants the Dept of the Air Force, Secretary of Defense, Donald Rumsfeld, Dept of the Air Force Michael Wynne, and Commander of the 446th AES, Col Mary Walker. | Dkt. No. 1 |
| **Apr 24, 2006** | Witt files declarations of fellow 446th AES members in support of the Complaint | Dkt. Nos. 9-18 |

| Apr 24, 2006 | Defendants do not put a litigation hold on party defendants, key decision makers, or any 446th AES unit members.  Defendants instruct someone at Air Force Reserve Headquarters and someone at the 446th Air Wing to segregate Maj Witt's personnel file, the inquiry file, and documents relating to her discharge proceedings | Kung Decl. Exs. P, Q, S, T, U, V |
|---|---|---|
| Sept 28-29, 2006 | Witt Discharge Board Proceedings at Robins AFB | Kung Decl. Ex. Z |
| July 10, 2007 | Secretary of the Air Force directs that Witt be discharged with an Honorable discharge | Dkt. No. 84 (Dunne Decl. Ex. C) |
| July 12, 2007 | Reserve Order issued discharging Witt with "Honorable Conditions Discharge" | Dkt. No. 84 (Dunne Decl. Ex. D) |
| Sept 2007 | Crabtree leaves McChord | Kung Decl. Ex. L (10:4-5) |
| Oct 23, 2007 | Domestic incident at the residence of SM-C and SM-D | Kung Decl. Ex. E (84:5-11); Ex. F (40:2-23); Ex. H |
| Oct 23, 2007 | Defendants supplement Ninth Circuit record with July 10 Action document but fail to disclose the July 12 Reserve Order | Dkt. No. 84 (Dunne Decl. Ex. C) |
| Oct 25, 2007 | McChord Incident Report Summary issued containing transcription of Tacoma Police Report concerning domestic incident, in which SM-C makes homosexual statement. | Kung Decl. Ex. H |
| ? | Moore-Harbert receives police report | Kung Decl. Ex. E (84:5-11); Ex. F(45:2-17) |
| ? | Moore-Harbert consults with JAG officer about administrative action based on possible fraternization | Kung Decl. Ex. E (84:18-21) |
| Nov 5, 2007 | Oral argument in Ninth Circuit | Dkt. No. 49-2 |

| Jan 24, 2008 | Moore-Harbert orders LTC Patrick Kearney to investigate fraternization between SM-C and SM-D, attaching a Police Blotter | Kung Decl. Ex. G |
|---|---|---|
| ? | Moore-Harbert issues SM-C a Letter of Admonishment and SM-D a Letter of Counseling | Kung Decl. Ex. E (86:20-25); Ex. K |
| ? | Moore-Harbert meets with SM-C and Robinson. Moore-Harbert tells SM-C that Robinson did not out her. | Kung Decl. Ex. F (44:12-45:21) |
| May 21, 2008 | Ninth Circuit issues its decision requiring an individualized analysis under DADT | Dkt. No. 49-2 |
| May 21, 2008 | Defendants do not put a litigation hold on party defendants, key decision makers, or any 446th AES unit members | Kung Decl. Exs. P, Q, S, T, U, V |
| June 10, 2009 | Defendants searched and gathered documents related to this case, and confirmed that previously segregated documents were maintained | Kung Decl. Ex. U |
| Feb 23, 2010 | Plaintiff propounds a Second Set of Requests for Production of Documents and Things to Defendants | Kung Decl. Ex. O |
| May 10, 2010 | Parties discuss outstanding discovery matters | Kung Decl. ¶ 17, Ex. P |
| June 1, 2010 | The Court grants Plaintiff's motion to compel production of documents | Dkt. No. 91 |
| June 21, 2010 | Air Force notifies Maj Witt of the amended order to correct the characterization of her discharge | Kung Decl. Ex. W |
| June 28, 2010 | Air Force issues an Honorable Discharge certificate to Maj Witt | Kung Decl. Ex. X |
| July 1, 2010 | Parties discuss file preservation and confirm that Defendants did not place litigation holds on Defendants' key decision-makers or 446th AES members | Kung Decl. ¶ 21, Exs. T, U, V |

# EXHIBIT B

Deposition of Lt. Gen. Charles Edwin Stenner, Jr. 5-17-10

Page 1

U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

MAJOR MARGARET WITT,

　　　Plaintiff,

vs                                               FILE NO.
                                                 C06-5195 RBL
UNITED STATES DEPARTMENT OF THE
AIR FORCE; DONALD H. RUMSFELD,
Secretary of Defense; MICHAEL W.
WYNNE, Secretary of the Department
of Air Force; and COLONEL MARY L.
WALKER, Commander, 446th
Aeromedical Evacuation Squadron,
McChord AFB,

　　　Defendants.

_____/

DEPOSITION OF

LIEUTENANT GENERAL CHARLES EDWIN STENNER, JR.

Monday, May 17, 2010
8:50 a.m.

Taken by counsel for the Plaintiff at:

Robins Air Force Base
Warner Robins, Georgia

Stenographically Reported By:

Gaye D. Traynor
Certified Court Reporter-B2209
State of Georgia

fe59ee42-b5dd-11de-b8ed-ba3f031ab753

Deposition of Lt. Gen. Charles Edwin Stenner, Jr. 5-17-10

Page 32

1   this deposition?

2        A    Other than...

3        Q    Other than counsel?

4        A    No.

5        Q    Okay.  And for how long did you speak with

6   counsel?

7        A    Over a period of two days, probably four or

8   five hours.

9        Q    Okay.  Do you understand that Major Witt is

10  seeking reinstatement to the Air Force Reserve, sir?

11       A    I do not know.

12            MR. PHIPPS:  Objection:  Calls for a legal

13       conclusion.

14  BY MS. DUNNE:

15       Q    Have you read the decision issued in this case

16  by the 9th Circuit in May of 2008?

17       A    No.

18       Q    What do you understand this case is now

19  about --

20            MR. PHIPPS:  Objection.

21       A    (No response.)

22  BY MS. DUNNE:

23       Q    -- since the 9th Circuit issued its ruling?

24            MR. PHIPPS:  Objection:  Calls for a legal

25       conclusion, beyond personal knowledge, foundation.

fe59ee42-b5dd-11de-b8ed-ba3f031ab753

Deposition of Lt. Gen. Charles Edwin Stenner, Jr. 5-17-10

Page 34

1        MR. PHIPPS:  If I instruct you not to answer,

2    and every now and then I may have to interrupt an

3    answer if it treads into an area of privilege.  But, in

4    general, my objections simply preserve our ability to

5    raise that later.  It would be convenient if we had a

6    Judge every time there was a deposition, but I'm

7    objecting.

8        THE WITNESS:  Okay.  Okay.  You give me the

9    question again.

10   BY MS. DUNNE:

11   Q   So I'm going to restate the question.  What do

12   you think the parties are disagreeing over right now?

13       MR. PHIPPS:  And I object:  Lack of foundation

14   and seeks a legal conclusion.

15       THE WITNESS:  I really don't know what the

16   disagreements are about.  Okay.

17   BY MS. DUNNE:

18   Q   Now, I'm going to ask you some questions with

19   respect to key individuals.  Do you know Major General

20   Robert Duignon?  Am I pronouncing that right?

21   A   Duignon, D-U-I-G-N-O-N.  Yes.

22   Q   How would you characterize your relationship

23   with him?

24   A   He preceded me in one of the jobs I had as the

25   Plans and Programs so I knew him.  And then he worked for

Deposition of Lt. Gen. Charles Edwin Stenner, Jr. 5-17-10

Page 35

1    me briefly when I took the job that I've got now.

2           Q    Okay.  When did he work for you?  What dates?

3           A    From June of 2008 until he retired in February

4    of 2009.

5           Q    February 2009.  Were you friends?

6           A    Acquaintances.

7           Q    Acquaintances.  How frequently do you speak

8    with General Duignon --

9           A    Duignon.

10          Q    -- Duignon now since he's retired.

11          A    I have not spoken to him since he retired.

12          Q    Have you ever spoken to General Duignon

13   regarding Major Witt?

14          A    No.

15          Q    Have you ever spoken to the General -- General

16   Duignon regarding this litigation?

17          A    No.

18          Q    Do you know General John Jumper?

19          A    Only by virtue of his position as the Chief of

20   Staff.

21          Q    So if you know him at all, it's only

22   professionally?

23          A    I've never had a conversation with him.

24          Q    So you've never spoken to him regarding

25   Major Witt or this litigation?

Deposition of Lt. Gen. Charles Edwin Stenner, Jr. 5-17-10

Page 36

1      A      No.

2      Q      How about General James Sherard?  Do you know

3   him?

4      A      Yes.

5      Q      How would you characterize your relationship?

6      A      He was my boss.

7      Q      Oh.  When was he your boss?

8      A      For the entire period of time that he was the

9   Chief of Staff or the Chief of the Air Force Reserve.

10     Q      So I think he was between -- I'm going to say

11   2000 to 2004, but I might be wrong on that.

12     A      He actually had a six-year tenure.

13     Q      Six-year?

14     A      So whatever period of time that covers.

15     Q      Okay.  And would you characterize your

16   relationship?  Are you friends?

17     A      Acquaintances.

18     Q      Acquaintances.  Do you still socialize after

19   -- since he's retired?

20            MR. PHIPPS:  Objection:  Characterization.

21            THE WITNESS:  Can you say that one more time?

22   BY MS. DUNNE:

23     Q      Yes.  Are you friends with General Sherard?

24     A      Acquaintances.

25     Q      Acquaintances.  Have you spoken to him since

Deposition of Lt. Gen. Charles Edwin Stenner, Jr. 5-17-10

Page 37

1   he retired in 2004?

2         A     Yes.

3         Q     How frequently do you speak with him?

4         A     Very infrequently.   Maybe twice.

5         Q     Okay.   Have you ever spoken to General Sherard

6   regarding Major Witt?

7         A     No.

8         Q     Have you ever spoken to General Sherard

9   regarding this litigation?

10        A     No.

11        Q     My next question is, do you know Lieutenant

12  General John Bradley?

13        A     I do.

14        Q     How would you characterize your relationship?

15        A     Friends.

16        Q     Friends?   How frequently do you speak with

17  General Bradley?

18        A     Very infrequently.

19        Q     Since he's retired in 2008, how often have you

20  spoken?

21        A     Maybe twice.

22        Q     Have you ever spoken to General Bradley

23  regarding Major Witt?

24        A     No.

25        Q     Have you ever spoken to General Bradley

Deposition of Lt. Gen. Charles Edwin Stenner, Jr. 5-17-10

Page 38

1   regarding this litigation?

2          A    No.

3          Q    Do you know General Crabtree?

4          A    I do.

5          Q    How would you characterize your relationship

6   with him?

7          A    Boss.

8          Q    Are you also friends as well?

9          A    Acquaintance.

10         Q    Acquaintance.   How frequently do you speak

11   with General Crabtree?

12         A    Weekly.

13         Q    Weekly?

14         A    Minimum.

15         Q    Have you spoken to General Crabtree regarding

16   Major Witt?

17         A    No.

18         Q    Have you spoken to General Crabtree regarding

19   this litigation?

20         A    No.

21         Q    Have you ever met Major Margaret Witt?

22         A    No.

23         Q    What do you know about Major Margaret Witt?

24         A    Only what I've seen regarding this -- this

25   circumstance.

Deposition of Lt. Gen. Charles Edwin Stenner, Jr. 5-17-10

Page 39

1        Q      Okay.  So I'm going to try to ask a bunch of

2   questions then to get at -- because I don't want to know

3   what work product you've been given.

4               What do you know about her career in the Air

5   Force -- the Regular Air Force?

6        A      Nothing.

7        Q      Okay.  What do you know about her career in

8   the Air Force Reserve?

9        A      Nothing.

10       Q      Okay.  Have you, yourself, done any research

11   on Major Margaret Witt?

12       A      No.

13       Q      Have you interviewed anyone who served with

14   Major Witt about Major Witt?

15       A      No.

16       Q      Have you questioned anyone who served with

17   Major Witt about Major Witt?

18       A      No.

19       Q      Have you read any news articles about

20   Major Witt?

21       A      No.

22       Q      Have you read her person -- any documents from

23   her personnel file?

24       A      No.

25       Q      Have you ever communicated to Colonel Janette

Deposition of Lt. Gen. Charles Edwin Stenner, Jr. 5-17-10

Page 40

1    Moore-Harbert about Major Witt?

2         A    No.

3         Q    Do you know who Colonel Janette Moore-Harbert

4    is?

5         A    No.

6         Q    It's Janette, J-A-N-E-T-T-E.  And it's

7    Moore-Harbert, M-O-O-R-E hyphen H-A-R-B-E-R-T.

8         A    Let me go back.  I've seen that name.

9         Q    Okay.

10        A    Okay?

11        Q    Have you ever directed one of your staff to

12   communicate with Colonel Moore-Harbert about Major Witt?

13        A    No.

14        Q    Have you ever directed one of your staff to

15   communicate with Colonel Moore-Harbert about this

16   litigation?

17        A    No.

18        Q    Do you know what unit Major Witt was assigned

19   to?

20        A    Yes.

21        Q    What is that unit?

22        A    446th AES.

23        Q    And what's the home base for the 446th AES?

24        A    McChord.

25        Q    And not the nickname.  Could I get the full

Deposition of Lt. Gen. Charles Edwin Stenner, Jr. 5-17-10

**Page 41**

1  name?

2       **A    Of the base?**

3       Q    Uh-huh.

4       **A    McChord Air Force Base.**

5       Q    Okay.

6       **A    Well, okay, they are currently a joint base so**

7  **it's McChord-Lewis, and I can't tell you the way that**

8  **would be...**

9       Q    It's now joint base Lewis-McChord.

10      **A    Okay.**

11      Q    I'm not so much of a fan of any name.

12           Sir, what do you know about the 446th AES?

13  What's its primary mission?

14      **A    Aeromedical evacuation.**

15      Q    Do you know which airlift wing the 446th is

16  connected to?  I would think of it as its host unit, if

17  I'm saying that right.

18      **A    It's the active-duty wing of McChord, and I**

19  **can't give you the number.**

20      Q    Okay.  It's the 62nd Airlift Wing.

21      **A    Okay.**

22      Q    Have you ever communicated with anyone in the

23  62nd Airlift Wing about Major Witt?

24      **A    No.**

25      Q    Have you ever communicated with anyone in the

Page 42

1    62nd Airlift Wing about this litigation?

2         A    No.

3         Q    What do you know, if anything, about the 446th

4    unit members and their social interactions with Major Witt

5    since she's been discharged?

6         A    Nothing.

7         Q    I have to ask these questions.

8              Have you ever served in the 446th AES?

9         A    No.

10        Q    Have you ever served with the 446th AES?

11        A    No.

12        Q    Have you ever visited the 446th at joint base

13   Lewis-McChord?

14        A    Yes.

15        Q    And when was that?

16        A    It was last year, 2009.  And I can't tell you

17   exactly when.

18        Q    Uh-huh.  Could you describe the unit culture

19   of the 446th AES?

20        A    No.

21             MR. PHIPPS:  Objection:  Foundation but...

22   BY MS. DUNNE:

23        Q    Have you ever served with the 4th Air Force?

24        A    No.

25        Q    Have you ever served...

fe59ee42-b5dd-11de-b8ed-ba3f031ab753

Deposition of Lt. Gen. Charles Edwin Stenner, Jr. 5-17-10

Page 44

1   commanders missions and how they executed those missions.

2       Q    Did you do anything else?

3       A    No.

4       Q    No?  Other than Major Witt, have you had any

5   experience with investigations, suspensions or discharges

6   of any service member on the grounds that they were

7   suspected of being gay or lesbian?

8       A    No.

9            MR. PHIPPS:  Objection:  Characterization.

10  BY MS. DUNNE:

11      Q    Have you ever served on an administrative

12  discharge board that was hearing a case involving

13  homosexual conduct?

14      A    No.

15      Q    Have you ever participated in a fact-finding

16  inquiry with respect to a service member concerning

17  homosexual conduct?

18      A    No.

19      Q    Have you ever served with a service member

20  that you knew to be gay or lesbian?

21      A    No.

22      Q    And by that, I mean they told you?

23      A    No.

24      Q    Have you ever served with a service member

25  that you suspected might be gay or lesbian?

Bull Darity Hopson & Worley, LLC - Board Certified Court Reporters - 478-405-5565

Deposition of Lt. Gen. Charles Edwin Stenner, Jr. 5-17-10

**Page 45**

1        A        No.

2        Q        Do you have any friends that are gay or

3    lesbian that you know of?

4        A        No, no.

5        Q        Do you have any relatives that you know of

6    that are gay or lesbian?

7        A        No.

8        Q        I'm asking this question in your personal

9    capacity only.  What is your opinion of the "Don't Ask;

10   Don't Tell" policy?

11       A        It's an Air Force policy.

12       Q        Is there anything else?  Do you have any other

13   opinion besides it's an Air Force policy in your personal

14   capacity?  This is your personal feelings.

15       A        I don't think I can separate my personal

16   feelings from my official capacity.

17       Q        Do you plan to provide an expert opinion to

18   the Court on the current "Don't Ask; Don't Tell" policy in

19   your official capacity?

20               MR. PHIPPS:  Objection:  Vague.

21       A        (No response.)

22   BY MS. DUNNE:

23       Q        Do you plan to provide an expert opinion to

24   the Court as to the efficacy of the current "Don't Ask;

25   Don't Tell" policy?

Deposition of Lt. Gen. Charles Edwin Stenner, Jr. 5-17-10

Page 58

1    A    It degraded.

2    Q    Degraded.

3         Same question but with respect to good order.

4    A    Degraded.

5    Q    Same question but with respect to discipline.

6    A    Degraded.

7    Q    Is there anything else -- you just shared

8    those experiences.  Is there anything else that helped

9    form the opinion you state in D (1)?

10   A    My experiences.  Or that's what I said the

11   first time.

12   Q    Uh-huh.

13   A    I think that's my experience.

14   Q    Have you done any particular research to

15   support the opinions that you stated in here?

16   A    No.

17   Q    So tell me if this is an accurate, fair

18   characterization; that your opinion in D (1) is based on

19   your 38 years of service in the military.

20   A    Yes.

21   Q    Besides your 38 years of experience in the

22   military, there's nothing else that the opinion you state

23   in D (1) is based on?

24   A    No.

25   Q    Have you ever asked Commanders or service

24

fe59ee42-b5dd-11de-b8ed-ba3f031ab753

Page 59

1  members how they felt about a uniform homosexual conduct

2  personnel policy?

3      A    No.

4      Q    Have you ever asked any Commanders or service

5  members whether they would accept a discretionary

6  personnel policy concerning homosexual conduct?

7      A    No.

8      Q    What if a different branch of the military

9  allowed certain service members to serve openly?  Would

10  that be disruptive to unit morale and cohesion for Air

11  Force Reserve units?

12      A    The key point is a policy that's applied

13  uniformly.  That's what I'm talking about.

14      Q    And so my question is a little bit different.

15  Let's say that a different branch, the Army or the Navy,

16  allowed certain service members who are gay or lesbian to

17  serve openly, that is, people could know they were gay or

18  lesbian.  Would that be disruptive to unit morale and

19  cohesion for Air Force Reserve units?

20      A    Don't know.

21      Q    Don't know?

22      A    The application of a policy -- uniform

23  application of a policy is what I'm talking about in here

24  as far as good order and discipline.

25      Q    So if the Army had a policy that allowed

fe59ee42-b5dd-11de-b8ed-ba3f031ab753

Page 72

1    don't object to the openly gay service member because the

2    policies have been applied properly and uniformly?

3            MS. DUNNE:  Objection:  Vague.  Objection:

4        Calls for a legal conclusion.

5            THE WITNESS:  Any policy that exists that is

6        applied uniformly is good for the unit cohesion, good

7        order and discipline and all of the other pieces and

8        parts of how to generate a capability for the war

9        fighter.

10   BY MS. DUNNE:

11       Q    Uh-huh.  So I hear that, is it fair to say

12   that your objection is not with the fact of their

13   homosexuality.  It's whether or not the policies are being

14   applied appropriately, correct?

15           MR. PHIPPS:  Objection:  Characterization.

16           THE WITNESS:  Uniformly.

17           MR. PHIPPS:  I'm going to object based on

18       characterization.

19           THE WITNESS:  Uniform application of the

20       policy is absolutely appropriate for and necessary for

21       unit cohesion, good order and discipline.

22   BY MS. DUNNE:

23       Q    Let me ask this.  Is it your understanding

24   that if Air Force conduct policies are applied uniformly

25   and regularly as to homosexual conduct, that would

26

Deposition of Lt. Gen. Charles Edwin Stenner, Jr. 5-17-10

Page 73

1    necessarily result in no gay or lesbian members serving

2    openly?

3              MR. PHIPPS:  Objection:  Vague, calls for

4        legal conclusion, calls for speculation.

5              THE WITNESS:  A policy that's not applied

6        uniformly degrades.  A policy that is applied uniformly

7        sustains unit cohesion, good order and discipline and

8        ultimately readiness for the war fighter.

9    BY MS. DUNNE:

10             Q    Do you understand what I mean when I say the

11   term "serve openly."  So gay or lesbian service members

12   serving openly.  Do you understand when I use that term?

13             MR. PHIPPS:  Objection:  Vague.

14        A    (No response.)

15   BY MS. DUNNE:

16             Q    What -- how would you define a service member

17   who is gay or lesbian, i.e., engages in acts with a member

18   of the same sex but they are serving in their unit and

19   everyone knows of their sexual orientation?  What's the

20   phrase you would use because I'm using...

21        A    The other option is for you to define what you

22   mean by openly gay.  So I'm -- because...

23             Q    So, sir, when I say openly gay and lesbian,

24   that means somebody who's serving within their unit that

25   other unit members and the Commander know they're gay or

Deposition of Lt. Gen. Charles Edwin Stenner, Jr. 5-17-10

Page 76

1              MR. PHIPPS:  Objection:  Assumes facts not in

2     evidence.

3              **A    (No response.)**

4     BY MS. DUNNE:

5              Q    You may answer the question.

6              **A    And the question was, whether I consider**

7     **myself highly qualified --**

8              Q    Highly qualified --

9              **A    -- prior to 1981?**

10             Q    -- prior to 1981.

11             **A    No.**

12             Q    What if you learned that discharge hearing

13    boards prior to 1981 would consider the service member's

14    fitness to serve and his effect on unit cohesion and

15    morale in deciding whether to retain or discharge the

16    service member who had admitted to homosexual conduct?

17    Would this alter your opinion that you're giving here

18    today?

19             **A    My opinion goes to the uniform application of**

20    **a policy.  I stand on the fact that that uniform**

21    **application is what leads to good order and discipline.**

22             Q    Is it fair to say that you're not opining that

23    the military can't logistically have a discretionary

24    conduct policy concerning gays because it already had one

25    historically?

Deposition of Lt. Gen. Charles Edwin Stenner, Jr. 5-17-10

1           MR. PHIPPS:  I'm going to object so I don't

2      interject again after we go to a question.

3    BY MS. DUNNE:

4           Q     Have a uniform policy today; didn't have one

5    prior to 1981.  Are you testifying today that you think it

6    is better for unit cohesion and morale to have a uniform

7    policy?

8           MR. PHIPPS:  I'm going to object to

9      characterization and vagueness.

10           THE WITNESS:  Okay.  I'm not -- you know, how

11      you use the word uniform is appropriate.  I believe the

12      uniform application of that policy is absolutely

13      necessary to sustain and maintain good order and

14      discipline, unit cohesion and subsequent readiness of

15      an individual unit.

16    BY MS. DUNNE:

17           Q     Okay.  Is there anything -- let me ask you

18    this:  Do you believe the U.S. military is incapable of

19    having discretionary conduct policies -- physically and

20    logistically can't have a discretionary conduct policy?

21           A     I do.  I believe that the policy has to be

22    uniformly applied cross the board.

23           (Plaintiff's Exhibit 5 marked for

24      identification.)

25    BY MS. DUNNE:

Page 82

1      Q    So that unit is not -- that unit that may be

2  currently allowing gays and lesbians to serve openly is

3  not consistent with current Air Force homosexual conduct

4  policies?

5            MR. PHIPPS:  Objection:  Calls for a legal

6     conclusion.

7            THE WITNESS:  The uniform application of a

8     policy is required.

9  BY MS. DUNNE:

10     Q    Okay.  Looking back to Exhibit 2, I'm looking

11  at specifically paragraph 2 -- D (2).  It's on page 3 and

12  goes over to page 4.

13           I'm going to get into a little bit more what

14  we were just talking about, the differences between the

15  components.

16           So you state in D (2):  Because there must be

17  a seamless integration between the Air Force Reserve and

18  the Regular component, there is a need for parity in their

19  personnel policies, including the homosexual conduct

20  policy.  It is exception for unit cohesion, morale, good

21  order, and discipline that similar rules of conduct apply

22  to Air Force Reservists and to Regular active-duty

23  members.  Is that -- is that your opinion?

24     A    It is.

25     Q    What's the basis for your opinion?

Deposition of Lt. Gen. Charles Edwin Stenner, Jr. 5-17-10

Page 83

1        A      My experience.

2        Q      Can you -- so, please, describe what in your

3    38 years of service helps you come to the opinion that you

4    came to in D (2).

5        A      Having worked in all three components --

6        Q      Uh-huh?

7        A      -- or with all three components.  Working in

8    two, working with the third and having moved many times,

9    that experience in the seamless integration of those three

10   components is absolutely essential for good order and

11   discipline.

12        Q      I'm going to break that apart a little bit so

13   the Court -- what do you mean by seamless integration?

14        A      I mean the ability to train to the same

15   standards and execute working together is seamless

16   integration.

17        Q      Are there challenges that the Regular Air

18   Force and the Reserves face in creating seamless

19   integration?

20        A      Always challenges as far as how to ensure we

21   are trained and ready.  The financial challenges, airspace

22   challenges.  But execution-wise it works very well.

23        Q      And maybe I'll ask it this way.  What are the

24   -- and can you explain a little bit more?  What are the

25   differences between the Reserves and the Regular Air

fe59ee42-b5dd-11de-b8ed-ba3f031ab753

Page 88

1   geographic region, I mean the state of Washington -- would

2   not be consistent with uniform -- with a uniform

3   application of policy across all geographic regions where

4   the Air Force serves?

5           A    I don't know that.  I don't know.

6           Q    You don't know?  Okay.

7                I'm going to turn to your third opinion that

8   specifically involves Major Witt.  In D (3) on page 4

9   states:  Major Witt's discharge from the Air Force

10  Reserves furthers basic military functionality as well as

11  unit cohesion, morale, good order and discipline because

12  if she were not discharged, that would mean that Air Force

13  personnel policies were not uniformly applied across

14  geographical boundaries, which would disrupt unit

15  cohesion, morale, good order, and discipline.

16               What's the basis for that opinion?

17          A    My experience.

18          Q    Is there anything particular in your

19  experience that leads you to that opinion?

20          A    No specific instance.

21          Q    Have you done any research?  Read any studies?

22          A    No.

23          Q    When you say "basic military functionality,"

24  what do you mean?

25          A    I mean execution of the mission.

Deposition of Lt. Gen. Charles Edwin Stenner, Jr. 5-17-10

Page 94

1          Q     How does Major Witt's discharge promote unit

2     cohesion as you've just defined it?

3          A     The uniform application of the policies that

4     led to the actions that have been taken are what are most

5     important for unit cohesion, good order and discipline.

6          Q     Is there any other way in which her discharge

7     promotes unit cohesion?

8                MR. PHIPPS:  Objection:  Scope of expert

9        testimony, foundation.

10               THE WITNESS:  Uniform application.  I'll go

11        back to that.  The personnel policies that exist.

12        Uniform application of those policies is necessary for

13        good order and discipline and unit cohesion.

14    BY MS. DUNNE:

15         Q     And I'm just trying to understand the basis

16    for your opinion or, I guess, just trying to understand as

17    Peter just said, the scope.

18               So you're only testifying -- you know what:

19    Let me strike that.

20               There's no other -- besides the uniform

21    application of the policy, you're not testifying as to any

22    other basis as to how her discharge promotes unit

23    cohesion; is that correct?

24         A     I can -- I can go back to this, and it would

25    be predischarge.  If she weren't discharged, then the

Deposition of Lt. Gen. Charles Edwin Stenner, Jr. 5-17-10

Page 95

1   policies had not been uniformly applied.

2        Q    So it sounds like because I'm trying to --

3   trying to make sure we get this accurate -- so it sounds

4   like from what you just said, you're testifying it's your

5   opinion that because there wasn't a uniform -- or, sorry.

6             You're testifying that -- I'm trying to see if

7   there's anything else that you're testifying with respect

8   to how her discharge promotes unit cohesion.  And it

9   sounds to me like you're just saying that it's the uniform

10  application of personnel policies, and that's it.  There's

11  nothing else.

12            This is what I'm trying to understand, if

13  there's anything else that you have to testify about with

14  respect to unit cohesion, how her discharge promotes unit

15  cohesion besides the application of -- besides the uniform

16  application of conduct policies.

17       A    I believe that to be true.

18       Q    Okay.  How do you define "unit morale"?

19       A    How the unit feels about itself and how they

20  perceive they're doing the job and how they get along.

21       Q    How do you define "good order" in terms of a

22  unit?

23       A    Proper procedures, proper implementation of

24  standards.

25       Q    And how do you define "discipline" as you've

fe59ee42-b5dd-11de-b8ed-ba3f031ab753

Deposition of Lt. Gen. Charles Edwin Stenner, Jr. 5-17-10

Page 96

1  used it -- the term here in D (3)?

2      A     The ability to be consistent, to be

3  disciplined about and to be consistent with the execution

4  of the jobs that are outlined for each unit.

5      Q     Okay.  Okay.  So getting back to unit morale,

6  how does her -- how does Major Witt's discharge further

7  unit morale?

8      A     The discipline that was in the system and the

9  process that was followed to the conclusions were within

10  the guidelines and the standards and the processes and the

11  execution of those personnel policies.

12      Q     Is your opinion based on the -- when I say the

13  unit, the 446th?  Or do you mean the 446th and other units

14  within the Air Force Reserves?

15      A     I'm talking about all units.

16      Q     And specific to the 446th, is it correct to

17  say that Major Witt's discharge furthers unit morale

18  because it's consistent with the uniform application of

19  conduct policies?

20      A     That uniform application of that led us to the

21  proper application of the standards that were there.

22      Q     Is there anything -- is there anything else

23  about Major Witt's discharge that furthers unit morale?

24          MR. PHIPPS:  Objection:  Foundation, scope of

25      expert opinion.

Deposition of Lt. Gen. Charles Edwin Stenner, Jr. 5-17-10

Page 97

1            THE WITNESS:  The discharge being the end

2    state.  Uniform application of the personnel policies

3    and the processes sustain good order and discipline.

4    BY MS. DUNNE:

5            Q    Are you providing any -- do you plan to

6    provide any expert testimony on how Major Witt's -- if --

7    or I should say the reinstatement of Major Witt may

8    further or not further unit morale?

9            MR. PHIPPS:  Objection:  Vague, misleading.

10           THE WITNESS:  Due process took us to the

11    discharge board.  And the uniform application of those

12    personnel policies --

13    BY MS. DUNNE:

14           Q    Uh-huh?

15           A    -- is what I'm talking about.

16           Q    And so just to answer this question, do you

17    plan to provide any testimony to the Court as to whether

18    Major Witt's reinstatement furthers or does not further

19    unit morale?

20           MR. PHIPPS:  Objection:  Vague, misleading and

21    the document speaks for itself.

22           THE WITNESS:  No, I don't.

23    BY MS. DUNNE:

24           Q    And then how does Major Witt's discharge

25    further unit good order?  And I'm saying unit.  You say

Deposition of Lt. Gen. Charles Edwin Stenner, Jr. 5-17-10

Page 98

1    good order here.  Is that -- let me rephrase that.

2                    How does Major Witt's discharge further good

3    order for the unit?

4        A    If we look at what it was that I stated, if

5    she were not discharged, we would not have been through

6    the uniform application of the personnel policies.

7        Q    Is there any other reasons that you plan to

8    testify to as to how Major Witt's discharge furthers unit

9    good order besides the uniform application of the policy?

10        A    The discharge -- and, again, I'll just read it

11    to you -- if she were not, that would mean the Air Force

12    personnel policies were not uniformly applied.

13        Q    Uh-huh.  And how does Major Witt's discharge

14    further unit discipline?

15        A    If she had not been discharged, we would not

16    have applied uniformly the policies and processes that

17    need to be followed.

18        Q    Is there any other reasons in your opinion

19    that Major Witt's discharge furthers unit discipline

20    besides the application of the uniform policy?

21                    MR. PHIPPS:  Objection:  Scope of expert

22        opinion, foundation.

23                    THE WITNESS:  Personnel policies and the

24        uniform application thereof led to an appropriate

25        action which sustains unit morale and good order and

Deposition of Lt. Gen. Charles Edwin Stenner, Jr. 5-17-10

Page 99

1    discipline.

2  BY MS. DUNNE:

3        Q    So it sounds like there's no other reasons

4  that Major Witt's discharge furthers unit discipline

5  besides the uniform application of the conduct policies?

6              MR. PHIPPS:  Objection:  Characterization,

7     scope of expert opinion, lack of personal knowledge.

8              THE WITNESS:  The discharge board did what

9     they did based on the facts that they had and sustained

10    good order and discipline in appropriately applying

11    those policies.

12  BY MS. DUNNE:

13       Q    Uh-huh.  For the -- for your opinion with

14  respect to how Major Witt's discharge furthers unit

15  morale, was the basis of your opinion your 38 years of

16  experience in the military?

17       A    **The good order and discipline and the morale**

18  **was sustained and maintained because we applied the**

19  **personnel policy that in my 35 -- 38 years is most**

20  **appropriate.**

21       Q    And so to get at that opinion that you just

22  stated, is there anything else besides your 38 years of

23  military experience that allows you to offer that opinion

24  to the Court?

25             Were there research studies that you've looked

Deposition of Lt. Gen. Charles Edwin Stenner, Jr. 5-17-10

Page 100

1    at?  Any academic studies that you can -- that you

2    reviewed in forming the opinions that you set forth in

3    Exhibit 2?

4         A    No.

5         Q    With respect to D (2), your opinion that you

6    gave in paragraph D (2)?

7              MR. PHIPPS:  This is Exhibit...

8         A    (No response.)

9    BY MS. DUNNE:

10        Q    I'm sorry, Exhibit 2, and then I'm

11   specifically looking at paragraph D, subsection 2, pages 3

12   and 4.  Besides your experience of 38 years in the

13   military, is there any other research that you've done to

14   support the opinion that you give in paragraph D (2)?

15        A    No.

16        Q    No.  Have you interviewed service members?

17        A    No.

18        Q    Sir -- okay.  There has been testimony in this

19   case that there are several members of the 446th who are

20   gay and lesbian, and other unit members are aware of their

21   sexual orientation.

22             There's also been testimony that the current

23   Commander of the 446th knows of their sexual orientation.

24   And, for example, that Commander disciplined one same-sex

25   couple within the unit for fraternization but did not

Page 102

1       evidence before the witness.

2              THE WITNESS:  I don't know about those.

3    BY MS. DUNNE:

4       Q    So given that you don't know about those, so

5    let's assume -- okay, let's assume you learn this, right,

6    because this is what's going to come at trial.  I mean,

7    the Judge -- let's just assume.  We'll raise it as a

8    hypothetical right now.

9              Let's say that we're dealing with the 446th

10   and that hypothetically you learned the current Commander

11   knows there are gays and lesbians in the unit.  They've

12   been disciplined for fraternization but not under "Don't

13   Ask; Don't Tell," same-sex couples.

14             How do you reconcile your opinions given today

15   with her behavior?

16       A    Who's behavior?

17       Q    The Commander.

18             MR. PHIPPS:  I'm going to object as

19   misleading.

20             THE WITNESS:  I don't know anything about what

21   it is you're saying.

22   BY MS. DUNNE:

23       Q    So what if you did learn?  Because the Judge

24   may ask you.  What if you did learn, sir, that the current

25   unit has gay and lesbian members who have been disciplined

fe59ee42-b5dd-11de-b8ed-ba3f031ab753

Deposition of Lt. Gen. Charles Edwin Stenner, Jr. 5-17-10

Page 106

1        Q    Are you aware that there's testimony in this

2    case from multiple unit members that believe her discharge

3    negatively affected unit morale and cohesion?

4        A    No.

5        Q    If you were made aware of such testimony that

6    they had testified that basically they love Major Witt,

7    she does a great job, they don't care about her sexual

8    orientation, they think her discharge was wrong, they

9    don't have any problem with her being reinstated, does

10   that change your opinions at all that you gave here today?

11       A    I stand on the opinions that I gave that a

12   uniform policy -- a uniform application of a policy is

13   necessary for good order and discipline.

14       Q    Are you aware that the only evidence thus far

15   that Major Witt's discharge furthers unit cohesion and

16   morale is a statement made by the current Commander and

17   then your opinion here today?

18            MR. PHIPPS:  Objection:  Characterization,

19       misleading.

20            THE WITNESS:  My opinion stands that we

21       followed a process that got us to a point, and it was

22       the uniform application of that process that leads to

23       the good order and sustains the good order and

24       discipline.

25   BY MS. DUNNE:

Deposition of Lt. Gen. Charles Edwin Stenner, Jr. 5-17-10

Page 114

1            THE WITNESS:  I don't know.

2    BY MS. DUNNE:

3        Q    Do you know if Canada is a member of NATO?

4            MR. PHIPPS:  Same objection.

5            THE WITNESS:  I don't know for 100 percent

6    certainty.

7    BY MS. DUNNE:

8        Q    I guess I'll ask it this way.  Do you know if

9    the United States military performs joint operations with

10   the Canadian military?

11       A    Yes, we do.

12       Q    Do you know whether or not Canada allow -- the

13   Canadian military allows their service -- allows gay and

14   lesbians to serve openly in their military?

15       A    I don't know.

16       Q    You don't know?  I'm going to ask about the

17   French military.  Do you know if the French military

18   allows gays and lesbians to serve openly?

19       A    I don't know.

20       Q    I'm going to ask about the German military.

21   Do you know whether the German military allows gay and

22   lesbian service members to serve openly?

23       A    I don't know.

24       Q    I'm going to ask about the United Kingdom.  Do

25   you know if the United Kingdom allows gays and lesbian

Page 115

1   members to serve openly?

2         A     I don't know.

3         Q     Have you done any research on foreign

4   militaries and their personnel conduct policies with

5   respect to homosexuality?

6         A     I've not.

7         Q     Has the United States conducted any joint

8   military operations with Canada or the United Kingdom in

9   the last seven years?

10         A     Yes, we have.

11         Q     Can you give me -- what would those be?  And

12   you don't have to name all of them.  I'm thinking of two

13   in particular:  Wars.

14         A     How about OEF and OIF.

15         Q     And for the record, could you explain what

16   those acronyms stand for?

17         A     OEF is Operation Enduring Freedom and are

18   those contingency operations in Afghanistan.

19               And OIF is Operation Iraqi Freedom, and those

20   are by definition in Iraq.

21         Q     When conducting joint military operations,

22   would U.S. service members ever serve side by side with

23   their NATO allied service members --

24         A     Yes.

25         Q     -- on a particular mission or assignment?

# EXHIBIT C

1

2     RECEIVED
      NOV 19 2009
3
      Carney Badley Spellman
4

5

6

7

8

Judge Ronald B. Leighton

9              UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF WASHINGTON
10                     AT TACOMA

11   MAJOR MARGARET WITT,                  )
                                           )
12                  Plaintiff,             )     No. C06-5195 RBL
                                           )
13         v.                              )     **DEFENDANTS' OBJECTIONS AND**
                                           )     **RESPONSES TO PLAINTIFF'S FIRST**
14   UNITED STATES DEPARTMENT OF           )     **REQUESTS FOR ADMISSION,**
     THE AIR FORCE, et al.,                )     **INTERROGATORIES, AND**
15                                         )     **REQUESTS FOR PRODUCTION**
                    Defendants.            )
16                                         )
                                           )
17                                         )
                                           )
18   _____  )

19         Pursuant to Rules 33, 34, and 36 of the Federal Rules of Civil Procedure, defendants the

20   Department of the Air Force; Robert M. Gates, the Secretary of Defense; Michael B. Donley, the

21   Secretary of the Air Force; and Colonel Janette Moore-Harbert, the commander of the 446th

22   Aeromedical Evacuation Squadron, McChord Air Force Base, hereby submit the following

23   objections and responses to Plaintiff's First Requests for Admission, Interrogatories, and

24   Requests for Production to Defendants.

25                        **GENERAL OBJECTIONS**

26         1.     Defendants object to the definitions and instructions in Plaintiff's First Requests

27   for Admission, Interrogatories, and Requests for Production to Defendants to the extent that they

28   conflict with or purport to expand upon Defendants' obligations under the Federal Rules of Civil

(C06-5195-RBL) DEFENDANTS' OBJECTIONS
AND RESPONSES TO PLAINTIFF'S FIRST
REQUESTS FOR ADMISSION, INTERROGATORIES,
AND REQUESTS FOR PRODUCTION - 1

1  If your response to this Request for Admission was "DENY" then pursuant to Rule 36(a)(4) state

2  in detail why you cannot truthfully admit it and answer the following interrogatory:

3      **OBJECTION:** Defendants object to this instruction to the extent that it purports to

4  impose an obligation that is not contained in Rule 36(a)(4). Instead, Rule 36(a)(4) requires a

5  detailed statement of "why the answering party cannot truthfully admit or deny it," only as an

6  alternative to admitting or specifically denying the statement. Fed. R. Civ. P. 36(a)(4).

7  **INTERROGATORY NO. 3**

8  Identify each person who either currently serves, or who has previously served, in the 446th

9  Aeromedical Evacuation Squadron, who is of the opinion that the presence of a known lesbian

10  within the 446th in the past had, or in the future would have, a negative impact on unit cohesion,

11  unit moral or unit discipline, and state all the facts known to defendants regarding such opinion.

12  When identifying each such person give their full name, rank, present duty assignment, present

13  address, or if not known the person's last known address, any known telephone number (home

14  and cell phone) and any known present email address (personal or military).

15      **RESPONSE:** Defendants incorporate by reference their objections to Request for

16  Admission No. 3 as objections to this interrogatory.

17      Defendants further object to this interrogatory because it asks two discrete questions:

18  (i) an identification of the persons who holds an opinion that the presence of a "known lesbian" in

19  the 446th Aeromedical Evacuation Squadron would have a negative impact on unit cohesion, unit

20  moral or unit discipline and (ii) an identification of all facts known to defendants regarding such

21  an opinion. Accordingly, this inquiry constitutes two separate interrogatories under Rule 33(a).

22      Defendants also object to this interrogatory as overly broad to the extent that it seeks

23  information for time periods predating Margaret Witt's assignment to 446th Aeromedical

24  Evacuation Squadron.

25      Defendants further object to this interrogatory as overly broad to the extent that it seeks

26  "all facts known to defendants regarding such opinion."

27      Moreover, defendants object to this interrogatory to the extent that it seeks the disclosure

28  of personal information protected by the Privacy Act.

(C06-5195-RBL) DEFENDANTS' OBJECTIONS
AND RESPONSES TO PLAINTIFF'S FIRST
REQUESTS FOR ADMISSION, INTERROGATORIES,
AND REQUESTS FOR PRODUCTION - 9

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 616-8482

46

1   Subject to and without waiving these objections and the General Objections, defendants

2   identify Colonel Janette Moore-Harbert and state that she is of the opinion that the presence of

3   Margaret Witt, a known lesbian, would negatively affect unit cohesion, morale, and discipline.

4

5   If your response to Request for Admission No. 3 was "DENY" then respond to the following

6   Request for Production:

7   **REQUEST FOR PRODUCTION NO. 3**

8   Produce every document which contains evidence supporting your denial.

9   **RESPONSE:**  Defendants incorporate by reference their objections to Request for

10   Admission No. 3 and Interrogatory No. 3 as objections to this request for production.

11   Defendants further object to this request for production to the extent that it seeks sensitive

12   information regarding the status and/or evaluation of the readiness of military forces.

13   Defendants also object to this request for production to the extent that it seeks documents

14   that are outside of defendants' possession, custody, or control.

15   Subject to and without waiving these objections, the General Objections and any

16   applicable privileges, defendants are unaware of any documents responsive to this request, *i.e.*,

17   that contain evidence of which persons hold opinions described in Request for Admission No. 3.

18

19   **REQUEST FOR ADMISSION NO. 4**

20   Admit or deny the truth of this statement: Defendants are unaware of the existence of any person

21   who either currently serves, or who has previously served, in the 446th Aeromedical Evacuation

22   Squadron, who has ever made any complaint of any kind regarding Major Witt's conduct or

23   character.

24   **RESPONSE:**  Defendants object to this request for admission as unduly burdensome to

25   the extent that it presupposes or requires information gathering that would be contrary to the

26   chain-of-command functionality of the military and/or that would compromise unit morale and

27   unit cohesion – Congress's stated goals underlying 10 U.S.C. § 654.

28   Defendants also object to this request for admission because plaintiff's use of the term

(C06-5195-RBL) DEFENDANTS' OBJECTIONS
AND RESPONSES TO PLAINTIFF'S FIRST
REQUESTS FOR ADMISSION, INTERROGATORIES,
AND REQUESTS FOR PRODUCTION - 10

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D C  20044
(202) 616-8482

47

Subject to and without waiving these objections and the General Objections, defendants state that no substantive answer is required to this interrogatory because their response to Request for Admission No. 8 was not an admission.

**REQUEST FOR ADMISSION NO. 9**

Admit or deny the truth of this statement: The reinstatement of Major Witt to service within the 446th Aeromedical Evacuation Squadron would likely have a negative impact upon unit morale, cohesion or discipline.

**RESPONSE:**  Defendants object to this request for admission as unduly burdensome to the extent that it presupposes or requires information gathering that would be contrary to the chain-of-command functionality of the military and/or that would compromise unit morale and unit cohesion – Congress's stated goals underlying 10 U.S.C. § 654.

Defendants object to the term "negative impact" as vague, capable of multiple meanings, and potentially misleading because it is unclear whether it refers to a person's overall impact or whether it refers to the specific impact of a particular act or attribute of that person.

Defendants object to plaintiff's use of the term "unit" because it is vague and ambiguous, as to whether that term as used by plaintiff refers to only members of the 446th Aeromedical Evacuation Squadron or whether it applies to other groups of military personnel who on a given assignment are required to work together as a unit.

Subject to and without waiving these objections and the General Objections, defendants admit the statement.

If your response to this Request for Admission was "ADMIT" then answer the following interrogatory:

**INTERROGATORY NO. 9**

Identify every person known to defendants who holds the opinion that the reinstatement of Major Witt to service within the 446th Aeromedical Evacuation Squadron would likely have a

(C06-5195-RBL) DEFENDANTS' OBJECTIONS
AND RESPONSES TO PLAINTIFF'S FIRST
REQUESTS FOR ADMISSION, INTERROGATORIES,
AND REQUESTS FOR PRODUCTION - 23

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 616-8482

48

1   negative impact on the unit morale, cohesion or discipline of the 446th Aeromedical Evacuation

2   Squadron.  When identifying each such person give their full name, rank, present duty assignment,

3   present address, or if not known the person's last known address, any known telephone number

4   (home and cell phone) and any known present email address (personal or military).

5       **RESPONSE:**  Defendants incorporate by reference their objections to Request for

6   Admission No. 9 as objections to this interrogatory.

7       Defendants further object to this interrogatory's request that defendants identify "every

8   person known to defendants" as overly broad and unduly burdensome to the extent that it requires

9   an identification of any person, however unrelated to the facts of this litigation, who holds such an

10  opinion.  Defendants likewise object to this interrogatory as inconsistent with Federal Rule of

11  Civil Procedure 26(a) governing the disclosure of expert testimony and the Court's pretrial

12  scheduling order setting an expert disclosure date of March 17, 2010.  Defendants also object to

13  this interrogatory to the extent that it seeks to learn information protected by the work-product

14  doctrine.

15      Moreover, defendants object to this interrogatory to the extent that it seeks the disclosure

16  of personal information protected by the Privacy Act.

17      Subject to and without waiving these objections and the General Objections, defendants

18  identify Colonel Janette Moore-Harbert.

19

20  If your response to Request for Admission No. 9 was "ADMIT" then respond to the following

21  Request for Production:

22  **REQUEST FOR PRODUCTION NO. 9**

23  Produce every document which contains evidence supporting your admission.

24      **RESPONSE:**  Defendants incorporate by reference their objections to Request for

25  Admission No. 8 and Interrogatory No. 8 as objections to this request for production.

26      Defendants further object to this request for production to the extent that it seeks sensitive

27  information regarding the status and/or evaluation of the readiness of military forces.

28      Defendants also object to this request for production to the extent that it seeks documents

(C06-5195-RBL) DEFENDANTS' OBJECTIONS
AND RESPONSES TO PLAINTIFF'S FIRST
REQUESTS FOR ADMISSION, INTERROGATORIES,
AND REQUESTS FOR PRODUCTION - 24

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 616-8482

49

# EXHIBIT D

1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

MAJOR MARGARET WITT,           )
                               )
             Plaintiff,        )
                               )
    v.                         )   No.  C06-5195 RBL
                               )
UNITED STATES DEPARTMENT OF    )
THE AIR FORCE, et al.,         )
                               )
             Defendants.       )
_____ )


DEPOSITION OF COLONEL MARY L. WALKER

*   *   *

January 8, 2010

1120 N.W. Couch

Portland, Oregon




Cheryl L. Vorhees, CSR, RPR
Court Reporter

Col. Mary Walker, 1/8/2010                Witt v. U.S. Department of the Air Force

1        Q    Let me read her comments from this OER from

2   Exhibit 13 into the record.  "Exceptional flight nurse

3   sith superb clinical skills in the aeromedical

4   evacuation patient movement system; always ready to

5   volunteer and support the mission whether in-garrison

6   at home station or at deployed location; exhibited

7   remarkable leadership skills as chief of Stan Eval,

8   meticulously monitoring crew members, currency,

9   qualification and proficiency ensuring 100 percent of

10  squadron taskings met and outstandingly performed;

11  member is unable to participate since November 2004

12  due to pending administrative discharge."

13       Is there anything in those comments that of

14  your personal knowledge you can say I disagree with?

15       A    No.

16       Q    Okay.  Have you ever held the opinion that

17  Major Witt's presence in the 446 has a negative impact

18  on unit cohesion or morale?

19       A    No.

20       Q    Have you ever held an opinion that if she

21  were reinstated to the unit that she would by being

22  reinstated have a negative impact on unit cohesion or

23  morale?

24       A    Never thought about it.

25       Q    I think that I'm done.  My practice is now if

Schmitt & Lehmann, Inc.
(360) 695-5554 ** (503) 223-4040

52

# EXHIBIT E

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

MAJOR MARGARET WITT,

                Plaintiff,

        v.

UNITED STATES DEPARTMENT OF THE
AIR FORCE, et al,

                Defendants.

No. C06-5195 RBL

DEPOSITION UPON ORAL EXAMINATION OF

COLONEL JANETTE MOORE-HARBERT

TAKEN AT

Carney Badley Spellman

701 Fifth Avenue, Suite 3600

Seattle, WA   98104

FEBRUARY 25, 2010

THURSDAY, 9:00 A.M.

Reported by:

MARIE WHITE, CSR # WH-IT-EM-*29906

1   Q.   Okay.

2   A.   I remember when I pinned on O-6, but I literally --

3        there's so many time elements that are all together

4        during that period of time.

5   Q.   Mm-hmm.

6   A.   I don't remember the exact date.

7   Q.   What was it you remembered in '06, when you became a

8        full colonel?

9   A.   Yes, when I actually got -- the date, yes, in 2006.

10  Q.   You said when I pinned on?

11  A.   Yes.

12  Q.   That is the phrase for --

13  A.   That is the phrase for when you get promoted to O-6.

14  Q.   Okay.

15  A.   Yes.

16  Q.   And when were you -- my understanding is you were made

17       Commander of the 446th some time in 2005?

18  A.   Correct, in October of 2005.

19  Q.   October?

20  A.   Yes.

21  Q.   You have been the Commander of the 446th ever since

22       then?

23  A.   Yes, Commander, and I am also the Senior Air Reserve

24       Technician, too.

25  Q.   I'm going to ask you some questions.  Go back now.

1  Q.   I don't care whether they --

2  A.   Again, when I look at from the standpoint of an

3       association, no, I do not remember anybody that I have

4       had as a connection with.  It is again it is possible

5       that they were, I just -- it is not something that I'm

6       asking or recognizing.

7  Q.   So first of all, no one ever came to you who was in the

8       military and said I am gay or lesbian; right?

9  A.   That's correct.

10 Q.   At any point in your career has anyone in the Air Force

11      or any other branch of the service come to you and say

12      that they suspect that a person is gay or lesbian?

13 A.   I don't remember that happening.

14 Q.   Really?

15 A.   I don't remember that happening.

16 Q.   You don't remember?

17 A.   Someone coming to me to say that I believe that this

18      person is gay.

19 Q.   In your thirty-two years do you remember having any

20      responsibilities that caused you to learn that somebody

21      was gay or lesbian other than Major Witt?

22 A.   To learn that?

23 Q.   Yes.

24 A.   I don't remember of that happening.

25 Q.   And using suspect the way I said it, that is that it

1    crosses your mind to think this person probably is of

2    this sexual orientation.   In thirty-two years other

3    than Major Witt have you ever suspected any other

4    person in the Armed Forces to be gay or lesbian?

5              MR. PHIPPS:  Objection, characterization and

6    form.

7  A.   I don't know.

8  Q.   You don't remember ever suspecting any such person?

9              MR. PHIPPS:  Objection, vague.

10  A.   My focus is I focus on the fact that I try to keep

11    myself professional.  I am not interested in finding

12    out.

13  Q.   I am not asking if you're interested.

14  A.   And from the standpoint of I don't lead myself down

15    that line of trying to say I am going to suspect one

16    way or the other.

17  Q.   So are you saying that you actively prevent yourself

18    from considering the possibility whenever you meet

19    anyone, you just don't want to consider it?

20  A.   I don't think that is an important avenue unless it

21    brought to me specifically against that criteria that

22    we discussed with the military.

23  Q.   Okay.

24  A.   That there is a concern.

25  Q.   How about outside the military?

1  Q.  Okay, but so in the case of your husband's friend,

2      apparently, your husband's friend was living with

3      another man, and that was one of the things that caused

4      you to suspect?

5  A.  Yes.  And that was many years ago.

6  Q.  Okay.  And are you telling me that you in your

7      thirty-two years in the military have never had

8      occasion to learn that a woman in the military was

9      living with another woman in the military in what

10     appeared to be a relationship?

11 A.  In my thirty-two years of being in the military

12     assuming that because two woman are living together

13     does not in my mind assume that they're gay.

14 Q.  That isn't quite what I asked.  But in the thirty-two

15     years that you have been in the military have you had

16     occasion to have it be made known to you that two women

17     are living together and having a relationship?

18 A.  No.

19 Q.  That has never happened?

20 A.  Not that I can remember.

21 Q.  What about        SM-C        ?

22 A.  Okay, what about        SM-C        ?

23 Q.  It never happened?  You never learned that

24     SM-C   was living with another woman and having a

25     relationship with another woman?

58

1    A.   I was never told that she was having a relationship.

2    Q.   Did you learn that she was living with another woman?

3    A.   My understanding was that they were renting from each

4         other.

5    Q.   How did you learn that they were renting and living

6         together?

7    A.   There was a report that came in regarding a conflict

8         that occurred, an argument that occurred that involved

9         the police.

10   Q.   Wasn't it a Domestic Violence Report?

11   A.   That was what was brought to me.

12   Q.   Wasn't it a Domestic Violence Report?

13   A.   I don't know.

14   Q.   Didn't it state that right on the report?

15   A.   I don't remember if it said domestic violence.   I know

16        that the concern was was because of the conflict that

17        came between the two of them.

18   Q.   What did you learn about that incident?

19   A.   I reported, I talked to the JAG about the issue, my

20        concern was fraternization of an officer and an

21        enlisted.

22   Q.   You were concerned --

23   A.   And that was my concern.

24   Q.   You were concerned that an officer shouldn't live with

25        an enlisted person under their Command?

1   A.   That's correct.   It is a fraternization issue.

2   Q.   Does it cross your mind that they were having a sexual

3        relationship?

4   A.   Did it cross my mind?

5   Q.   Yes.

6   A.   No, my focus was fraternization.

7   Q.   It didn't cross your mind?

8   A.   My focus was fraternization.

9   Q.   Did it cross your mind?

10  A.   My focus was fraternization.

11  Q.   Did it cross your mind that they were having a sexual

12       relationship?

13            I don't care what your focus was.

14            Did it cross your mind?

15  A.   No, because my issue was fraternization.

16  Q.   Okay, and did you learn how they came to be living

17       together?

18  A.   I had someone that I actually had initiation of what

19       was called a command directive investigation on the

20       issue of fraternization.  And I don't know how they

21       came together.  The issue was the fact that the

22       fraternization issue of the two of them renting, one

23       renting from the other, the officer and the enlisted,

24       was inappropriate.

25  Q.   Didn't you learn that -- what is the name of the other

1     woman?  It was Carlson and the other woman was?

2  A.        SM-D           .

3  Q.              SM-D          ?

4  A.  That's correct?

5  Q.  Did you learn how where      SM-D        had been

6      before she was with the 446th?

7  A.  No.

8  Q.  You never learned that?

9  A.  She was -- she came into our squadron as a ████

10     ██████████████.  And the only thing in that I knew

11     was that she was also what is called a ████████████

12     ████████████████████████.

13  Q.  You didn't learn why she came and transferred to the

14     446th?

15  A.  No, I was unaware why she came, she came over and was

16     hired as the ████████████████████.

17  Q.  So no one ever suggested to you that she came in order

18     to live with     SM-C     .?

19  A.  Nope.

20  Q.  Okay.  Did you discipline either of these people?

21  A.  Yes, I did.

22  Q.  Who did you discipline?

23  A.  I gave      SM-C     , it's      SM-C      now, a

24     Letter of Admonishment for the fraternization issue.

25     And      SM-D        got a Letter of Counseling.

1   A.   He confirmed fraternization.

2   Q.   That is not what I am asking.

3   A.   I don't have the Police Report in front of me.   He

4        confirmed fraternization.

5   Q.   Okay.   To you that means that he confirmed they lived

6        together in the same house?

7   A.   He confirmed that an officer and an enlisted were

8        living together.

9   Q.   Anything else he confirmed?

10  A.   Not in the CDI.

11  Q.   Did he confirm they had a domestic incident?

12  A.   I don't have the report in front of me to be able to

13       refer to.

14  Q.   Who did he interview?

15            MR. PHIPPS:   Objection, foundation.

16  A.   Again I don't have the report.

17  Q.   You don't remember who he interviewed?

18  A.   It more than likely would have been the parties

19       involved.   But I don't have it in front of me.

20  Q.   Okay.   And after you got the report did you at that

21       point have any reason to suspect that either one of

22       these women was a lesbian?

23  A.   Suspect based off of the criteria that we talked about

24       suspect?

25  Q.   Suspect the way that I have consistently asked you the

1      question about suspect.  Did it cross your mind?

2  A.  And in this particular instance, I am using suspect

3      based off of the criteria.

4  Q.  Okay, but I'm not.  I'm asking you after you read this

5      report did it cross your mind?

6  A.  I don't know.

7  Q.  SM-C      is still with the unit?

8  A.  Yes, she is.

9  Q.  Did this incident cause in your opinion any morale

10     problems in the unit?

11  A.  I don't know that the information went out in the unit

12     regarding this.  This is not something that we will

13     discuss --

14  Q.  You think nobody else knows it?

15  A.  I have no idea.  I don't go out and tell the unit of

16     the incident?

17  Q.  So you have no sense of whether anyone else in the unit

18     knows about it?

19  A.  That's correct.

20  Q.  When you gave the Letter of Admonishment to

21     SM-C    was anyone else present?

22  A.  There was.  I can't remember who it was.

23  Q.  Did you instruct whoever it was to keep it secret and

24     not tell anyone?

25  A.  Well, it's an action that occurs between a Commander

# EXHIBIT F

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | | |
|---|---|---|
| MAJOR MARGARET WITT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | C065195RBL |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| THE AIR FORCE; COLONEL MARY L. | ) | |
| WALKER, Commander 446th | ) | |
| Aeromedical Evacuation | ) | |
| Squadron, McChord Air Force | ) | |
| Base; and JAMES G. ROCHE, | ) | |
| SECRETARY, DEPARTMENT OF THE | ) | |
| AIR FORCE, | ) | |
| | ) | |
| Defendants. | ) | |

DEPOSITION UPON ORAL EXAMINATION OF JILL ROBINSON

APPEARANCES:

    FOR THE PLAINTIFF:        JAMES E. LOBSENZ
                                  CARNEY, BADLEY, SPELLMAN
                                  701 FIFTH AVENUE, SUITE 3600
                                  SEATTLE, WASHINGTON   98104

    FOR THE DEFENDANTS:      PETER J. PHIPPS
                                    STEPHEN J. BUCKINGHAM
                                  U.S. DEPARTMENT OF JUSTICE
                                  20 MASSACHUSETTS AVENUE NW
                                  WASHINGTON, DC   20044

MARCH 16, 2010

1      with her partner, or...  Yeah.

2   Q  How did you first learn about the alleged domestic

3      violence incident?

4   A  I saw bruises on   SM-D   s arm.

5   Q  Did then did you ask   SM-D   about that?

6   A  Yes.

7   Q  What did she say?

8   A  Myself and Leslie Pellegrini were in the office and

9      asking her about it, and she stated that she's fine,

10     that she was fine.  And bruises were there.  And it came

11     back to be centered on   SM-C   that had caused the

12     bruises.  And then from there, I believe what was

13     transpired was there ended up being an exercise that

14     went overseas to Hawaii that the majority of the

15     squadron went on, and then at that point somebody had

16     stated that I had gone in and up-channeled information

17     related to   SM-C   up the chain of the Air Force.  And

18     SM-C   approached me about it asking why.  And I had no

19     part of up-channeling of any information.  So,...  There

20     was an accusation made that I had turned her in, I had

21     access to Col. Moore-Harbert's office while she was gone

22     as the commander on this deployment and floated this

23     upward.

24  Q  So, is this right,   SM-C   basically approached you,

25     approached you and accused you of outing her?

41

1    A    Yes.

2    Q    You said that it began with a discussion I guess

3         somewhere in the building in the office about bruises.

4         At that point, did you know prior to that day that

5         SM-C   lived with   SM-D   ?

6    A    Yes.

7    Q    Prior to that day, did you believe   SM-C   and   SM-D   to

8         be having a relationship?

9    A    Yes.

10   Q    And I take it that's something   SM-C   never told you;

11        right?  She never said, "I am a lesbian"?

12   A    Correct.

13   Q    And   SM-D   never said, "I am a lesbian"?

14   A    Correct.

15   Q    But it's something you believed?

16   A    Correct.

17   Q    Prior to this day that you saw the bruises on

18        SM-D      , did you know anything about how   SM-C

19        and   SM-D   had come to be together?

20   A    I believe it was started as, I believe -- and this is

21        where I can be wrong, that it was on a deployment

22        overseas.

23   Q    That they met?

24   A    Yes.

25   Q    Had you ever been to their house that they shared?

1    A    Yes.

2    Q    Had you been to their house prior to there domestic

3         violence incident?

4    A    Yes.

5    Q    One thing I didn't understand is you mentioned something

6         about an exercise that the whole unit was on, an

7         exercise; is that what you said?

8    A    Yes.   There was -- I forgot the -- I don't remember the

9         name of it.   But it was over in Hawaii.   And so

10        Col. Moore-Harbert was over there along with many other

11        people.   And there was only a few people in the squadron

12        back here just coming in to do their requirements.

13   Q    So, I don't understand.   What happened while you were in

14        Hawaii that's related to this?

15   A    I wasn't in Hawaii.   I was at the squadron.

16   Q    Okay.

17   A    And so what came back was while I was at the squadron,

18        SM-C   was also there, and all doing our own independent

19        things.   And then I got a call while I was at home from

20        her stating that information had gotten back to people

21        in Hawaii that I had up-channeled information.

22   Q    Oh, I see.

23   A    And so, I -- Yeah, I spent a good couple hours talking

24        to SM-C   about it, and I don't...

25   Q    So, at this point, when most of the unit is in Hawaii,

1    you and SM-C are not in Hawaii?

2    A    Correct.

3    Q    And when you're saying you spent a couple hours talking

4         to SM-C , is that in person or over the phone?

5    A    Over the phone.

6    Q    I take it in this conversation SM-C is upset?

7    A    Yes.

8    Q    Angry at you?

9    A    Maybe.  Confused.  Not understanding why I got

10        information.

11   Q    And because you're the executive assistant, you have

12        access to the commander's desk; is that right?

13   A    I do not.

14   Q    You do not?

15   A    I do not.

16   Q    But SM-C thought you did?

17   A    Correct.  Or there was, there was a belief assumed that

18        I did, therefore I was the one that was responsible for

19        the information getting out there, and that I had

20        up-channeled it.

21   Q    So, you told SM-C , I take it, "I did not up-channel

22        it.  I did not tell Moore-Harbert anything"?

23   A    I -- Right.  I mean, Col. Moore-Harbert was over there,

24        and I went through the whole explanation of my access,

25        my inability to get access to that information.  I don't

Robinson Jill   03-16-2010

44

1          have access to her office.  Don't have access to the

2          information that she thought was forwarded upward.

3     Q    So, you told SM-C this?

4     A    Correct.

5     Q    And what did she say?

6     A    I felt as though I lost a friendship.

7     Q    Did she say whether she believed you or not when you

8          said, "I didn't do this"?

9     A    No, I don't believe that she actually said anything.  It

10         was a matter of I was put in a place to convince.

11    Q    Then what happened?

12    A    I spoke to Col. Moore-Harbert about it when she got

13         back --

14    Q    What did --

15    A    -- and asked her to explain it to SM-C , that I don't

16         have this information.

17    Q    And was she willing to do that?

18    A    Yes.

19    Q    Did she do that?

20    A    I believe she did.

21    Q    What makes you say you believe that she spoke to --

22    A    -- because I was there when the three of us talked.

23    Q    So --

24    A    -- And so it was explained in her office that while this

25         allegation was there, that I wasn't the source, that I

1          didn't have access.

2     Q    Did Col. Moore-Harbert explain what was the source of

3          her information?

4     A    No.

5     Q    Did she mention the police report?

6     A    The police report was part of what the source was, but I

7          don't recall her actually explaining it to SM-C about

8          the specific police report.  I remember the

9          conversations that when reports come through with

10         domestic violence and the police officers arrive at the

11         house and they're military, it still gets crossed over

12         to the military side.  So, that I recall is information,

13         and so...

14    Q    That information that the police share their reports

15         with the military, was that information, did it come

16         from Col. Moore-Harbert or someone else?

17    A    I believe it came from Col. Moore-Harbert.

18    Q    In this three-person conversation, did you form an

19         opinion as to whether SM-C was convinced that you were

20         not the person who outed her?

21    A    I don't think she'll ever be convinced.

22    Q    You don't?

23    A    (Non-verbal negative response.)

24    Q    So, did it permanently damage the friendship?

25    A    Uh-huh.

# EXHIBIT G

*(filed under seal)*

# EXHIBIT G

## *(filed under seal)*

For document refer to Exhibits G-K to Declaration of Sher Kung in Support of Motion for
Sanctions due to Spoliation of Evidence.

# EXHIBIT H

*(filed under seal)*

# EXHIBIT H

## *(filed under seal)*

For document refer to Exhibits G-K to Declaration of Sher Kung in Support of Motion for
Sanctions due to Spoliation of Evidence.

# EXHIBIT H

## *(filed under seal)*

For document refer to Exhibits G-K to Declaration of Sher Kung in Support of Motion for
Sanctions due to Spoliation of Evidence.

# EXHIBIT H

## *(filed under seal)*

For document refer to Exhibits G-K to Declaration of Sher Kung in Support of Motion for
Sanctions due to Spoliation of Evidence.

# EXHIBIT H

# *(filed under seal)*

For document refer to Exhibits G-K to Declaration of Sher Kung in Support of Motion for
Sanctions due to Spoliation of Evidence.

# EXHIBIT H

## *(filed under seal)*

For document refer to Exhibits G-K to Declaration of Sher Kung in Support of Motion for
Sanctions due to Spoliation of Evidence.

# EXHIBIT I

*(filed under seal)*

# EXHIBIT I

## *(filed under seal)*

For document refer to Exhibits G-K to Declaration of Sher Kung in Support of Motion for Sanctions due to Spoliation of Evidence.

# EXHIBIT J

## *(filed under seal)*

# EXHIBIT J

## *(filed under seal)*

For document refer to Exhibits G-K to Declaration of Sher Kung in Support of Motion for Sanctions due to Spoliation of Evidence.

# EXHIBIT J

## *(filed under seal)*

For document refer to Exhibits G-K to Declaration of Sher Kung in Support of Motion for
Sanctions due to Spoliation of Evidence.

# EXHIBIT K

*(filed under seal)*

# EXHIBIT K

## *(filed under seal)*

For document refer to Exhibits G-K to Declaration of Sher Kung in Support of Motion for Sanctions due to Spoliation of Evidence.