1

HONORABLE RONALD B. LEIGHTON

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
9                                    AT TACOMA

10   MAJOR MARGARET WITT,

11                  Plaintiff,                       Case No. 06-5195RBL

12
           v.
13                                                   MEMORANDUM OPINION

14   UNITED STATES DEPARTMENT OF THE
     AIR FORCE; et al,
15
                    Defendants.
16

17

18

19

20        Plaintiff Margaret Witt challenges the constitutionality of the statute known as "Don't Ask, Don't

21   Tell" ("DADT") found at 10 U.S.C. § 654, and its implementing regulations (in the case of the Air Force

22   Reserve, through Air Force Instruction 36-3209).  Witt claims that her discharge under DADT violated

23   both her procedural and substantive due process rights under the due process clause of the Fifth

24   Amendment.

25        This Court has jurisdiction over the claims raised in this case pursuant to 28 U.S.C. § 1331 and 28

26

27   U.S.C. § 1346 because plaintiff's claims arise under the Constitution of the United States, the laws of the

28   United States, and a regulation of an executive department of the United States.  This Court also has

1   jurisdiction over the claims raised here under the Administrative Procedures Act, 5 U.S.C. § 702 et. seq.

2   Trial was conducted from September 13, 2010 through September 21, 2010.

## I.  PROCEDURAL HISTORY

Plaintiff commenced this action by filing a Complaint on April 12, 2006.  On July 26, 2006, this Court granted the government's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), concluding that the regulation was subject to rational basis scrutiny, and that the evidentiary hearings held, and factual findings adopted, by Congress provided a sufficient foundation to support the regulation.  Plaintiff timely appealed.

The Ninth Circuit agreed with plaintiff.  It held that *Lawrence v. Texas*, 539 U.S. 558, 123 S. Ct. 2472 (2003) effectively overruled previous cases wherein the Ninth Circuit had applied rational basis review to DADT and predecessor policies.  It held that something more than traditional rational basis review was required.  *Witt v. Department of the Air Force*, 527 F.3d 806, 813 (9th Cir. 2008).  The Circuit Court vacated the judgment and remanded to the District Court the plaintiff's substantive and procedural due process claims.  It affirmed this Court's dismissal of the plaintiff's equal protection claim.  On remand, this Court was directed to determine whether the specific application of DADT to Major Witt significantly furthers the government's interest, and whether less intrusive means would substantially achieve the government's interest.  *Witt*, 527 F.3d at 821.

These two questions are central to the Court's evaluation of the substantive due process claim.  The procedural due process claim was not ripe when presented to the Ninth Circuit inasmuch as Major Witt had not yet been discharged and did not then allege she had been deprived of life or a property interest in violation of her procedural due process rights.  She has since been honorably discharged.

## II.  STANDING

This Court has previously determined that Major Witt has standing to pursue this action.  She has suffered an injury in fact which is concrete and particularized and actual, not conjectural or hypothetical. There is a causal connection between the injury and the conduct complained of and, finally, it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561, 112 S. Ct. 2130 (1992).  The Ninth Circuit confirmed that Witt has standing.

## III.  "DON'T ASK DON'T TELL"

Congress adopted DADT in 1993.  Following extensive fact-finding hearings, Congress made detailed findings on the subject of gays and lesbians serving openly in the military.  Those findings deserve mention here:

(1)   Section 8 of Article I of the Constitution of the United States commits exclusively to the Congress the powers to raise and support armies, provide and maintain a Navy, and make rules for the government and regulation of the land and naval forces.

(2)   There is no constitutional right to serve in the armed forces.

(3)   Pursuant to the powers conferred by Section 8 of Article I of the Constitution of the United States, it lies within the discretion of the Congress to establish qualifications for and conditions of service in the armed forces.

(4)   The primary purpose of the armed forces is to prepare for and to prevail in combat should the need arise.

(5)   The conduct of military operations requires members of the armed forces to make extraordinary sacrifices, including the ultimate sacrifice, in order to provide for the common defense.

(6)   Success in combat requires military units that are characterized by high morale, good

order, discipline, and unit cohesion.

(7)     One of the most critical elements in combat capability is unit cohesion, that is, the bonds of trust among individual service members that make the combat effectiveness of a military unit greater than the sum of the combat effectiveness of the individual unit members.

(8)     Military life is fundamentally different from civilian life in that - -

     (A)     the extraordinary responsibilities of the armed forces, the unique conditions of military service, and the critical role of unit cohesion, require that the military community, while subject to civilian control, exist as a specialized society; and

     (B)     the military society is characterized by its own laws, rules, customs, and traditions, including numerous restrictions on personal behavior, that would not be acceptable in civilian society.

(9)     The Standards of Conduct for members of the armed forces regulate a member's life for 24 hours each day beginning at the moment the member enters military status and not ending until that person is discharged or otherwise separated from the armed forces.

(10)    Those standards of conduct, including the Uniform Code of Military Justice, apply to a member of the armed forces at all times that the member has a military status, whether the member is on base or off base, and whether the member is on duty or off duty.

(11)    The pervasive application of the standards of conduct is necessary because members of the armed forces must be ready at all times for worldwide deployment to a combat environment.

(12)    The worldwide deployment of United States military forces, the international responsibilities of the United States, and the potential for involvement of the armed forces in actual combat routinely make it necessary for members of the armed forces involuntarily to accept living conditions and working conditions that are often spartan, primitive, and

characterized by forced intimacy with little or no privacy.

(13)   The prohibition against homosexual conduct is a longstanding element of military law that continues to be necessary in the unique circumstances of military service.

(14)   The armed forces must maintain personnel policies that exclude persons whose presence in the armed forces would create an unacceptable risk to the armed forces' high standards of morale, good order, discipline, and unit cohesion that are the essence of military capability.

(15)   The presence in the armed forces of persons who demonstrate a propensity or intent to engage in homosexual acts would create an unacceptable risk to the standards of morale, good order, discipline, and unit cohesion that are the essence of military capability.

10 U.S.C. § 654.

Collectively, these findings of fact represent the best evidence of the important government interest advanced by DADT.  The implementing language of the statute provides that a member of the armed forces "shall be separated" from military service if he or she: 1) has engaged in, attempted to engage in, or solicited another to engage in a homosexual act or acts, 2) has stated that he or she is a homosexual or bisexual, or 3) has married or attempted to marry a person "known to be of the same biological sex."  10 U.S.C. §§ 654(b)(1), (b)(2), and (b)(3).

There are exceptions in the DADT statute but none is applicable in the case now before the Court.

## IV.  FACTS

Margaret Witt joined the Air Force as a Second Lieutenant in 1987.  She was promoted to First Lieutenant in 1989, to Captain in 1991, and to Major in 1999.  In 1995, she transferred from active to

reserve duty and, as a flight nurse, was assigned to the 40th Aeromedical Evacuation Squadron (AES), later to become the 446th.

The 446th AES consists of approximately 150-170 service personnel including flight nurses and medical technicians.  Their mission is to convert cargo aircraft into flying "intensive care units" (ICU) and to transport wounded and injured military personnel throughout the military's medical system.  Squadron members typically fly in five-person crews.  As reservists they fly at least once every 60 days, they participate in drill weekends and they serve two weeks active duty (annual tour) each year.  They are subject to worldwide deployment at any time depending on the needs of the country they serve.

Major Witt was selected to serve as the Chief of Standards & Evaluation (StandEval) for the 446th Squadron based on her knowledge of pertinent regulations and policies and procedures and her leadership skills.  As Chief of StandEval, Witt was responsible for evaluating the other flight nurses. She was acknowledged by her fellow flight nurses to possess superior job skills, a calm demeanor under pressure and the ability to coalesce her subordinates into an effective, proficient team.

During her service in the military, Witt received the meritorious Service Medal, the Air Medal, the Aerial Achievement Medal, the Air Force Commendation Medal, and numerous other awards and commendations.  Her annual "Officer Performance Reviews" were routinely high.

Starting in October 2003, plaintiff engaged in a romantic relationship with Laurie McChesney.  At the time that Major Witt began her relationship, Ms. McChesney was married to Pat McChesney.  In June of 2004, Pat McChesney sent an email to the Air Force Chief of Staff stating that Major Witt had engaged in a sexual relationship with his wife.

The Wing Commander, General Eric Crabtree, became aware of the allegations against Major Witt and sought and obtained authority from General Robert Duignan to investigate the alleged sexual conduct between Major Witt and another woman.  The Air Force learned that Major Witt had a previous six-year relationship with another woman, Tiffany Jensen.  The Commander of the 446th, Colonel Mary

Walker, followed General Crabtree's order and initiated a separation proceeding.  She suspended Major

Witt from any further participation in unit activities and forwarded Witt's case to Air Force Headquarters

for an administrative discharge board hearing pursuant to AFI 36-3209.

In his investigative report, Major Adam Torem acknowledged that despite Major Witt's probable

commission of adultery "it was never the intention of 446 AW/JA to pursue criminal prosecution of

Major Witt for any such offense."  Investigative Report Dkt. 119-5 at pp. 28-29.

A hearing was held before an administrative discharge board of three officers in September of

2006.  At the hearing, Major Witt was given the opportunity to make a sworn statement subject to cross-

examination or an unsworn statement without the possibility for cross-examination.  She made an

unsworn statement.  She also submitted documents and statements from others on her behalf.  After

evidence was reviewed, the Board found that Major Witt had engaged in homosexual conduct and

recommended that she be honorably discharged by the Secretary of the Air Force.  On July 12, 2007,

Major Witt was discharged effective October 1, 2007.

## V.  DISCUSSION

**A.    Application of DADT to Major Witt Does Not Significantly Further the Government's
Interest in Promoting Military Readiness, Unit Cohesion and Morale.**

The Ninth Circuit has clearly enunciated the Constitutional test that must be applied to DADT.

Because DADT constitutes an intrusion "upon the personal and private lives of homosexuals, in a manner

that implicates the rights identified in *Lawrence*, it is subject to heightened scrutiny."  *Witt*, 527 F.3d at

819.  To survive plaintiff's constitutional challenge, the statute must (1) advance an important

governmental interest, (2) the intrusion must significantly further that interest, and (3) the intrusion must

be necessary to further that interest.

As in other cases where heightened scrutiny has been applied, the burden is on the government to justify the law and its intrusion into the lives of those complaining about its application to them. *See City of Cleburne v. Cleburne Living Ctr. Inc.,* 473 U.S. 432, 447, 105 S. Ct. 3249 (1985). Were the burden on the plaintiff, the findings and conclusions of this Court would be the same.

The fact-finding task the Ninth Circuit sets for this Court is less clear. The Ninth Circuit has held that the heightened scrutiny analysis is as-applied rather than facial. "This is the preferred course of adjudication since it enables courts to avoid making unnecessarily broad constitutional judgments." *Id*. at 447. This Court was directed to consider the facts of the individual case to determine not whether DADT is supported by some hypothetical, post-hoc rationalization in general, but whether a justification exists for the application of the policy to Major Witt. *Witt*, 527 F.3d at 819.

The Ninth Circuit held that it is clear that DADT advances an important government interest. DADT concerns the management of the military, and "judicial deference to . . . congressional exercise of authority is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged" *Witt,* 527 F.3d at 821 [internal citation omitted]. The Circuit Court held that it was unclear on the record before it whether DADT, as applied to Major Witt, satisfies the second and third prongs of the three-part test outlined above.

The Circuit Court set this Court on its current course with the following direction:

> The Air Force attempts to justify the policy by relying on congressional findings regarding "unit cohesion" and the like, but that does not go to whether the application of DADT specifically to Major Witt significantly furthers the government's interest and whether less intrusive means would achieve substantially the government's interest. Remand therefore is required for the district court to develop the record on Major Witt's substantive due process claim. Only then can DADT be measured against the appropriate constitutional standard.

*Id.*

While both parties acknowledge that the important government interest is directed at unit morale, good order, discipline, and cohesion, they differ about the kind of evidence the court should consider when applying the second and third prongs of the three-part test. The government emphasizes the deference to be given to Congressional management of the military and seeks a restrained examination limited to a determination of the alignment between Major Witt's career in the military and the factual findings adopted by Congress when enacting DADT. For example, if Major Witt was in the past, and presumably would be in the future, subject to world-wide deployment where primitive facilities and forced intimacy would be the norm, then Congress' findings of fact Nos. 11 and 12 would be implicated. Presumably, the greater the relationship between the career and conduct of Major Witt and the predictive findings of Congress, the greater the likelihood that DADT survives the Constitutional challenge as applied to Major Witt.

Added to this calculus, is the government's plea for uniformity. Lt. General Charles Stenner, the government's expert, made the unassailable point that uniformity and consistency in the administration of personnel policies is a desirable objective. When similar people are treated differently, morale and cohesion suffer. The government argues that Major Witt's continued military service necessarily would result in the application of a different personnel policy to her than to other service members, such as those in the First Circuit, where the DADT statute was upheld as constitutional. *See, Cook v. Gates*, 528 F.3d 42, 60 (1st Cir. 2008). The argument proves too much, however. The call for uniformity defies as-applied analysis. By definition, if uniformity is required, exceptions cannot be encouraged. And if exceptions cannot be encouraged, as-applied analysis is pointless. The direction to this Court to apply DADT to the specific circumstances of Major Witt compels it to reject any notion that the overriding need for uniformity trumps individualized treatment of Major Witt.

Major Witt's approach to the fact finding mission of this Court was to present testimony of members and former members of her unit, the 446th AES, who testified persuasively that serving with Margaret Witt and other known or suspected gay and lesbian service members did not adversely affect unit morale and cohesion.  To the contrary, it was Major Witt's suspension and ultimate discharge that caused a loss of morale throughout the squadron.  In addition, several other former service members testified about their military experience as closeted gays or lesbians and the positive reaction of their fellow servicemen and women once they acknowledged their sexual orientation.  Finally, expert witnesses were called to inform the Court about the most up-to-date research concerning the interaction of disparate peoples within a military organization, the experience of other militaries which allow open service of gays and lesbians and finally, current polling data on the attitudes of servicemen and women (current and former) about the subject of open service of gays and lesbians.  All of this information provided some evidence concerning the likely affect of Major Witt's open service as a lesbian flight nurse upon unit morale and cohesion, in the 446th AES and beyond.

The Court is convinced from its thorough reading of the *Witt* decision that an in-depth, particularized examination of Major Witt's circumstances vis-a-vis DADT is what the Circuit Court contemplated when remanding the case for further proceedings.  Support for this conclusion is found at footnote 11, wherein the Court recited some of the facts that caused it to doubt whether the government's interest was significantly furthered by Major Witt's suspension and subsequent discharge under DADT:

> Major Witt was a model officer whose sexual activities hundreds of miles away from base did not affect her unit until the military initiated discharge proceedings under DADT and even then, it was her suspension pursuant to DADT, not her homosexuality, that damaged unit cohesion.

*Witt,* 527 F.3d at 821.

The facts deemed worthy of mention by the Court of Appeals are inconsistent with the more deferential analysis advocated by the government.  Rather, a complete review of the history of Major Witt's service, including her conduct as an officer, as well as her sexual orientation, must be evaluated within the context of the squadron in which she served, its mission, its personnel and its culture.

The evidence produced at trial overwhelmingly supports the conclusion that the suspension and discharge of Margaret Witt did not significantly further the important government interest in advancing unit morale and cohesion.  To the contrary, the actions taken against Major Witt had the opposite effect.  The 446th AES is a highly professional, rapid response, air evacuation team.  It is comprised of flight nurses and medical technicians who are well-trained, well-led and highly motivated.  They provide a vital service to our fighting men and women around the world.  Serving within that unit are known or suspected gay or lesbian service men and women.  There is no evidence before this Court to suggest that their service within the unit causes problems of the type predicted in the Congressional findings of fact referenced above.  These people train together, fly together, care for patients together, deploy together.  There is nothing in the record before this Court suggesting that the sexual orientation (acknowledged or suspected) has negatively impacted the performance, dedication or enthusiasm of the 446th AES.  There is no evidence that wounded troops care about the sexual orientation of the flight nurse or medical technician tending to their wounds.

The evidence before the Court is that Major Margaret Witt was an exemplary officer.  She was an effective leader, a caring mentor, a skilled clinician, and an integral member of an effective team.  Her loss within the squadron resulted in a diminution of the unit's ability to carry out its mission.  Good flight nurses are hard to find.

The evidence clearly supports the plaintiff's assertion that the reinstatement of Major Witt would not adversely affect the morale or unit cohesion of the 446th AES.  The only evidence to the contrary comes in the form of survey responses and preference polls.  These surveys and polls are some evidence

that there may be persons in the 446th AES who would prefer that gays and lesbians not serve openly within their unit but such preferences are not outcome determinative here.  The men and women of the United States military have over the years demonstrated the ability to accept diverse peoples into their ranks and to treat them with the respect necessary to accomplish the mission, whatever that mission might be.  That ability has persistently allowed the armed forces of the United States to be the most professional, dedicated and effective military in the world.  The reinstatement of Major Margaret Witt will not erode the proficiency of the United States military.

The government urges the Court to evaluate the constitutionality of DADT as applied to Major Witt by looking beyond the impact on her specific unit, the 446th AES.  In support of the Congressional findings underpinning DADT, the government can point to polls and petitions which reflect Congress' fear that openly serving gays and lesbians will negatively impact military readiness by eroding unit morale and  cohesion across the services without regard to any one individual's billet or job description.  Again, these polls are some evidence that some folks would prefer to not serve with admitted homosexuals.  That such views may lead to a drop in recruitment or retention is a possibility, just as it was a possibility during the integration of blacks, other minorities and women into the armed forces.

The possibility of such push back is off-set by the known negative impact of DADT upon the military: the loss of highly skilled and trained military personnel once they have been outed and the concomitant assault on unit morale and cohesion caused by their extraction from the military.  In this regard, the Court notes the Army's policy of deploying openly gay or lesbian personnel if the discharge process has not yet begun when the order to deploy issues.  (Exh. 121).  In this time of war, the Army, at least, has decided that allowing openly gay service is preferable to going to war without a member of a particular unit.

The government also asks the Court to include within its analysis the added factor that, for a relatively brief period of time during their relationship, Major Witt's partner was a married woman.

Adultery is a violation of the Uniform Code of Military Justice which can subject the offending officer to discipline.  In this case, however, no charges were filed against Major Witt because she was headed for administrative discharge under DADT. (Dkt. 119-5 at pp. 28-29).  Major Witt was discharged pursuant to DADT and not because she had committed adultery.  She was given an Honorable Discharge without qualification or any reference whatsoever to adultery.  Under the circumstances presented here, the Court will not speculate on what the Air Force would have done to punish Major Witt, if anything, had she been charged with adultery and the Court will certainly not accept an uncharged offense or allegation as a basis for sustaining an otherwise unconstitutional discharge.

For the reasons expressed, the Court concludes that DADT, when applied to Major Margaret Witt, does not further the government's interest in promoting military readiness, unit morale and  cohesion. If DADT does not significantly further an important government interest under prong two of the three-part test, it cannot be necessary to further that interest as required under prong three.  Application of DADT therefore violates Major Witt's substantive due process rights under the Fifth Amendment to the United States Constitution.  She should be reinstated at the earliest possible moment.

The government argues that the Air Force cannot "assign to the Reserve . . . a nurse who does not actively practice nursing." Air Force Instruction (AFI) 36-2115, ¶ 1.11.5.  The regulation quantifies what it means to be actively practicing nursing by prescribing a minimum of 180 hours active engagement in nursing per calendar year.  Plaintiff concedes that she does not currently meet that experience requirement.  If she chooses to resume her duties within the 446th AES, she must meet the proficiency requirements to the same extent and in the same manner that other flight nurses in the 446th have met those same requirements.

**B.     Plaintiff's Procedural Due Process Claim is Without Merit.**

The Court of Appeals determined that Major Witt's procedural due process claim was not yet ripe because she had not yet been discharged.  To support a procedural due process claim plaintiff must

establish that she has a constitutionally protected life, liberty, or property interest that was taken from her without due process.  The Court of Appeals remanded plaintiff's procedural due process claim for the limited purpose of examining the discharge papers that reflect the reasons for her discharge and to determine whether those papers will result in a stigma.  *Witt*, 527 F.3d at 812.

Plaintiff's discharge papers reflect that she was Honorably Discharged and that no reason was given for the discharge.  There is no stigma resulting from an Honorable Discharge.  No other liberty or property interest having been asserted, there is no violation of Major Witt's procedural due process rights. *See Schultz v. Wellman*, 717 F.3d, 301, 307 n. 15 (6th Cir. 1983) (finding that an honorable discharge does not carry with it any stigma or restrictions on future employment which might conceivably trigger due process considerations); *see also, e.g., Sims v. Fox*, 505 F.2d 857, 862 (5th Cir. 1974) (holding that an Air Force Reserve Officer has no property interest in continued military employment).

Finally, the evidence establishes that Major Witt received due process in the procedures that were followed by the Air Force Reserves.[1]  She received notice of the charges and a full opportunity to present evidence and to challenge the charge against her.  Witt's procedural due process claim is **DISMISSED.**

## VI.  CONCLUSION

The application of "Dont's Ask Don't Tell" to Major Margaret Witt does not significantly further the government's interest in promoting military readiness, unit morale and cohesion.  Her discharge from the Air Force Reserves violated her substantive due process rights under the Fifth Amendment to the United States Constitution.  She should be restored to her position as a Flight Nurse with the 446th AES as soon as is practicable, subject to meeting applicable regulations touching upon qualifications necessary for

---

[1] The plaintiff's argument that the investigation process was irregular because it was initiated by someone other than Major Witt's <u>immediate</u> commander is without merit.  The Air Force Instruction governing separation of Air Force Reserve members (Air Force Instruction 36-3209) provides that only the member's commander is authorized to initiate fact-finding inquiries involving homosexual conduct and that the term commander <u>usually</u> refers to the member's immediate commander.  This investigation was initiated by a commanding officer with authority to administer the Uniform Code of Military Justice for the 446th AES.  The exercise of authority to initiate an investigation and discharge proceedings was lawful, even if it was not usual.

MEMORANDUM OPINION
Page - 14

1    continued service.

2         Dated this 24th day of September, 2010.

3

4

5         RONALD B. LEIGHTON
          UNITED STATES DISTRICT JUDGE
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28